[No. S004522, Crim. No. 23059. July 11, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ALLEN WILLIAMS, Defendant and Appellant.

**COUNSEL**

Jeffrey J. Stuetz, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Jesus Rodriguez, Jay M. Bloom, Michael D. Wellington and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

MOSK, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190.1 et seq.). As we shall explain, we conclude that the judgment must be affirmed.

Together with Norman Lee Steeg and Kevin John Finckel, defendant was charged with the first degree murder (Pen. Code, § 187) and robbery (*id.*, § 211) of Gregory Lock. A felony-murder-robbery special circumstance (*id.*, § 190.2, subd. (a)(17)(i)) was also alleged, as were enhancements for being armed with a firearm (*id.*, § 12022, subd. (a)) and personally using such a weapon (*id.*, § 12022.5). Prior to trial Finckel pleaded guilty to second degree murder and agreed to testify against defendant and Steeg. Defendant and Steeg were tried separately. Defendant, who was tried first, was convicted of robbery and first degree murder, was found to have committed the murder while engaged in the robbery and to have used and been armed with a firearm, and was sentenced to death. Like defendant, Steeg was convicted of robbery and first degree murder and was found to have

committed the murder while engaged in the robbery and to have used and been armed with a firearm; he was sentenced, however, to life imprisonment without possibility of parole.

At trial the prosecution called several witnesses in presenting its theory that defendant had personally killed Lock in the course of the robbery. The prosecution's crucial witness was Finckel. Finckel testified that about 9 p.m. on September 29, 1981, he and defendant—whom he had met in July of that year and who sometimes used the alias of "Michael Brandon"—were released from the San Diego County jail, into which they had been booked earlier that day; neither had any money. On their release, they went to Mission Beach to look for Steeg—whom Finckel had known for about a year—and between 10 and 11 p.m. found him at a bar. Steeg was armed with a .38-caliber revolver.

The three men spoke of burglarizing the apartment of one David Beardsley in Riverside, a topic they had previously discussed; Finckel had met Beardsley in August when Beardsley picked him up hitchhiking and let him stay in his apartment for four or five days. The three men agreed to commit the burglary. Because they did not have an automobile, they discussed how to get to Riverside. Finckel wanted to hitchhike; Steeg suggested they obtain a ride from a friend of his nicknamed "Mad Dog"; Finckel and defendant agreed they would not ride with "Mad Dog."

While at Mission Beach, Finckel went on, the three men encountered one Thomas Plaski. Plaski lived in the North Park area of San Diego and had known defendant, Steeg, and Finckel for two or three months. Plaski gave the trio permission to spend the night at his house.

After leaving the bar, the three walked toward the ocean and then headed down the boardwalk in the direction of a roller coaster. In a parking lot near the roller coaster, they saw Gregory Lock, who was a sailor, trying to "push-start" his automobile, a white 1978 Oldsmobile hatchback with Florida license plates. They asked whether he needed help and Finckel asked if they could have a ride. Lock responded he would give them a ride in exchange for their help. The car was started and the four men entered: Lock was in the driver's seat, defendant was next to him, and Steeg and Finckel were in the rear seat, Steeg behind Lock and Finckel behind defendant.

Soon, Finckel continued, the group was proceeding north on Interstate Highway 5. Steeg then pulled out his gun and stuck it into Lock's neck. Defendant told Lock to pull over, but Steeg disagreed and instructed him to keep driving. Defendant told Lock to empty his pockets and took his wallet and some change. Lock asked if he could keep some of his identification

documents and defendant said yes. Eventually the direction of travel changed and the car began to proceed south.

Between 1 and 2 a.m. the group arrived in National City and Steeg ordered Lock to pull off the road. As Lock drove to a deserted area near a warehouse, Steeg told him to stop. Steeg instructed defendant to get out and handed him the revolver. He then ordered Lock out of the car. Defendant then directed Lock to walk toward a telephone pole located about four feet behind the car. When Lock reached the pole, defendant told him to lean against it and, after he complied, shot him twice in the back. Lock screamed and started running; defendant fired another round and took up the pursuit; about 75 to 100 yards from where he had started Lock fell to the ground and defendant shot him 3 more times in the back. Defendant then ran back to the car.

With Steeg driving, Finckel's testimony continued, the three men went back to the beach to look for Plaski, but were unsuccessful. They then drove to Plaski's home to spend the night. While there, defendant burned Lock's wallet and some identification papers in the backyard. The next morning, Plaski arrived home. Steeg had a conversation with Plaski, in the course of which he said he had a stolen car parked a couple of blocks away. Plaski left to go to a store; while he was gone, the trio departed.

The three men then drove Lock's car to La Jolla, where Steeg sold some tickets to a Rolling Stones concert. From there they drove to Riverside to burglarize Beardsley's apartment. Finckel, who could barely read or write because of dyslexia, had Beardsley's address written on a piece of paper and gave it to Steeg. They waited until dark. Finckel then telephoned Beardsley, who said he would not be home that evening. Later, while Steeg remained in the car, defendant and Finckel broke into Beardsley's apartment and stole a .38-caliber revolver, two cameras, hashish oil, and other items.

After committing the burglary, Finckel went on, the three men drove to Long Beach to attempt to sell the hashish oil. There they encountered one Shane Magee. Finckel had never met Magee before—apparently defendant had—and told his companions not to trust him and not to talk about the shooting. Along with Magee, the three men eventually drove to Las Vegas.

After arriving in Las Vegas apparently on October 1 or 2, Steeg rented a room for the trio—room 28—at the Villa Inn Motel. They brought both guns into the room—the murder weapon and Beardsley's revolver—and Steeg fired the murder weapon, apparently by accident, in Finckel's direction. The trio discussed their lack of money and made arrangements to sell the items taken in the Beardsley burglary. Magee pawned one of the

cameras and arranged for the trio to meet with one Dana Cowen. Steeg sold a suitcase containing the stolen items to Cowen and split the proceeds with defendant and Finckel.

Magee also testified on behalf of the prosecution. Apparently on September 30, he encountered defendant, Steeg, and Finckel in Long Beach; he had previously met defendant at Mission Beach. In the presence of defendant and Finckel, he was told by Steeg the trio had killed someone and that if he chose to go with them he would be going at his own risk; he was also told they had left an item of identification on the victim. Magee agreed to help the trio sell the hashish oil. The four men drove to the Santa Monica pier; when they could not find any buyers there, they drove to Ontario, and then to Las Vegas.

On October 1 or 2, Magee continued, he had a stranger off the street pawn the camera for him for $30, and gave some of the proceeds to the stranger and the rest to Steeg. Apparently during the evening of October 2, he traded some of the hashish oil to a drug dealer for what proved to be bogus "dope." He found the dealer and recovered what remained of the hashish oil and received $10 for the amount the dealer had already used; he took the money and spent a dollar of it on a drink. At this point defendant approached him, became angry because he had kept the money and had not given it to Steeg, and accused him of trying to cheat them. Without expressly referring to Lock, defendant said he had killed someone for a car and would do it again for two or three hundred dollars. Magee returned the remaining $9 to Steeg.

Magee decided to part company with the trio. During the morning of October 3, he flattened a tire on Lock's car and made an anonymous call to the Las Vegas Metropolitan Police Department from a telephone booth at the Villa Inn, in the course of which he implicated defendant, Steeg, and Finckel in the murder and robbery of Lock.

Dana Cowen also testified for the prosecution. Apparently on October 1 or 2, she was introduced to the trio by Magee. Defendant and Steeg began negotiations with her on the sale of items which she knew to be stolen, with Steeg taking the major role. At first Steeg discussed selling both guns, but then one or more of the trio expressed a desire to keep one of the weapons. An argument ensued. She eventually agreed to buy a suitcase full of items for $60. At some point Steeg admitted to her that he had killed a man; when she asked him why, he replied, "For money."

Among the prosecution's other witnesses were Frances Rodriguez and two jailhouse informants, William Moore and Roderick Darby. Rodriguez

testified that on the morning of September 30 she had discovered that her .38-caliber revolver, a watch, and a number of tickets to a Rolling Stones concert had been stolen from her bedroom dresser drawer; during the month of September Steeg had permission to stay at her home; and on September 28 he had been in her bedroom when she removed a Rolling Stones concert ticket from her dresser drawer to give to him. Each of the jailhouse informants, who had previously been convicted of theft-related felonies, stated that defendant had made certain admissions in his presence.

The testimony of other prosecution witnesses established without dispute that on September 28, 1981, defendant, Steeg, and Finckel were together in San Diego and were stopped by a police officer. Similarly established was the fact that when found Lock's body bore a single piece of military identification. Also established was the fact that as a result of Magee's anonymous tip the Las Vegas police took defendant, Steeg, and Finckel into custody on October 3, 1981.

The prosecution sought to prove its case through physical evidence as well as testimony. Among the items it introduced at trial were the following: the .38-caliber revolver stolen from Rodriguez, which an expert witness identified as the murder weapon; photographs of the white Oldsmobile hatchback; two .38-caliber cartridges; a burnt wallet and pieces of burnt paper that bore the words "Gregory" and "Union" (Lock had financed his car through the Navy Federal Credit Union)—all of which were recovered from Plaski's backyard; the piece of paper bearing Beardsley's name; and the suitcase and its contents sold to Cowen.

The defense was alibi. In support, defendant attacked the credibility of Finckel and the two jailhouse informants: he presented evidence concerning each man's character and sought to show the information that the inmates related could have come from sources other than defendant himself. A secondary defense of intoxication or diminished capacity was suggested through the testimony of Finckel, who was called as a defense witness and stated generally that on the night of the killing defendant was "acting like he was on LSD" and may have consumed the substance. Defendant did not testify.

In the prosecution's case-in-chief at the penalty phase, one William Carl testified that during the early morning hours of September 29, 1981, he and his wife were asleep in their home in San Diego. Awakened by his dogs, Carl found "two invaders in our fenced yard, in the rear of our residence," and called the police. He confronted the "invaders," who turned out to be defendant and Finckel, and asked them to leave; they did. He then went out to the boardwalk to watch for the police and the two men returned and

asked if he was looking for them. Defendant threatened Carl by telling him he "belonged to the Mafia, and he had a gun on his hip, and if I talked to the police I would be dealt with." The two men left the area, but were soon apprehended by the police.

Magee testified that while in Las Vegas he and defendant, Steeg, and Finckel discussed how to get money. Defendant suggested that when a woman pulled up to a stop sign he would jump in her car, seize her purse, and then take the car to escape.

Finckel testified that when defendant returned to the car after shooting Lock, he said he liked doing the deed. During the next several days until the time of arrest, never in his presence did defendant express sorrow, regret, or remorse for what he had done. Finckel substantially corroborated Magee's testimony on defendant's robbery plan: "He said that he—to wait until the car stopped at a red light, and hop into a car and pull the gun out, and take the guy's money." He had seen defendant take many drugs, including LSD and amphetamines. On the night of the shooting defendant was acting as he had while under the influence of LSD. He did not see defendant ingest any drugs after their release from jail on the night of the killing, but was not with him all the time and did in fact observe him with people who had previously supplied him with drugs.

Darby, one of the jailhouse informants, testified that defendant said to him he enjoyed killing Lock and liked the sight of the blood and the end of the pistol in Lock's stomach. Defendant never told him he was sorry for killing Lock or expressed in his presence any remorse or regret for the murder.

On behalf of the defense, defendant's father, Dennis Williams, and mother, Christine Mosely, presented an extensive family history. Both Williams and Mosely had been emotionally disturbed children, and Williams had been physically abused. Williams enlisted in the Navy. When he was 18 years old and Mosely was 17, they married; defendant was born 6 months later, on September 20, 1962; 4 other children followed in quick succession. From the very beginning marriage and family life were stormy; there were financial and psychological problems; and just as Williams had himself been abused, so did he in turn abuse his wife and children. At about 12 years of age defendant was sexually molested by his stepgrandfather and began to experience significant difficulties in dealing with men, especially men in positions of authority. In his teenage years he started using drugs and alcohol, had several run-ins with the police, was confined more than once in juvenile detention facilities, and dropped out of high school; he was small in stature, and defensive on that point. Williams and Mosely's marriage,

which had always been far from stable, broke up when Mosely chose to leave and marry a family friend, who was a sailor. As the marriage broke up so did the family.

Several neighbors of the Williams family testified that Williams and Mosely failed to give their children the love, attention, and discipline they needed, and that Williams was violent and taught his children to be violent.

On the issue of defendant's use of drugs, the defense called Thomas Plaski and David Janowsky, M.D., a professor of psychiatry and a psycho-pharmacologist. Plaski testified he met defendant three or four months before the shooting; he had seen him take LSD and, under its influence, act "hyper"; on the night of the killing he saw him twice, the last time near midnight, and observed him to be "very hyper." Dr. Janowsky gave expert testimony about drug intoxication and impairment. He stated that under the influence of drugs such as LSD or amphetamines a person could become psychotic.

Dr. Thomas Gitchoff, a criminologist, was of the opinion that defendant became a violent person as a result of the violence he had suffered, but that he would be able to conform to the requirements of prison life.

## I. *Guilt Issues*

Defendant makes a number of contentions relating to the question of guilt. None, as we shall explain, establishes reversible error.

### A

Defendant contends in substance that the police entry into room 28 of the Villa Inn Motel in Las Vegas was unlawful, that this illegality tainted various items of evidence obtained as a result of the entry—including, notably, Finckel's testimony for the prosecution, the murder weapon, and Lock's automobile—and that the denial of a motion to suppress that evidence was erroneous and subjected the defense to prejudice. For the reasons given below, we cannot agree that the ruling was error.

### 1

Before we can properly address defendant's claim we must present a somewhat detailed summary of the procedural history of the motion to suppress and of the evidence presented at the hearing.

Defendant filed a motion under Penal Code section 1538.5, in which Steeg and Finckel joined, seeking to suppress certain evidence discovered by the police in the course of or following 13 alleged searches or seizures executed in Las Vegas, including the murder weapon and Lock's car. Prominent among defendant's arguments was that the officers entered room 28 without a warrant and all the evidence sought to be suppressed was obtained as a result of this primary illegality.

On the ground that almost all the challenged searches and seizures were made without a warrant, defendant asked the court to adopt the procedure established in *Wilder* v. *Superior Court* (1979) 92 Cal.App.3d 90, 96-97 [154 Cal.Rptr. 494]—i.e., the prosecution would first be required to present its justification for the police conduct and he would then respond. The prosecution opposed the motion as contrary to usual procedure, established by law and court rules, under which the moving party has at least the burden of going forward to define the issues.

Before the suppression motion was heard, Finckel pleaded guilty to murder in the second degree and agreed to testify against defendant and Steeg.

At the opening of the hearing, Judge William Low addressed defense counsel as follows: "[The] *Wilder* procedure is very, very unsatisfactory, you have to point up what the issues are, and as far as I am concerned, the burden is on you to at least point up what the court is looking for and so I'll rule that you have the burden. . . . It is very, very unsatisfactory. As far as I am concerned you have the burden." Judge Low then granted a continuance to allow the defense to prepare more detailed points and authorities.

Defendant applied for and obtained a certificate under the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases (Pen. Code, § 1334 et seq.; Nev.Rev.Stats., § 174.395 et seq.) to compel the presence of 10 Las Vegas police officers at the hearing. Subsequently he filed a petition in the Eighth District Court of the State of Nevada, located in Las Vegas, to enforce the certificate. The Nevada court granted the request insofar as five of the officers were concerned and denied it as to the rest. Defendant unsuccessfully sought reconsideration.

The continued hearing on the suppression motion was conducted before Judge Sheridan Reed. Evidently as a result of Judge Low's ruling on the burden of proof, only the defense called witnesses. The witnesses included Finckel and Detective Joseph McGuckin and Officers Robert De Hoedt and John Schultz of the Las Vegas Metropolitan Police Department. The record of that hearing tells the following tale.

Apparently on October 1 or 2, 1981, defendant, Steeg, and Finckel arrived in Las Vegas and, after Steeg signed the register, occupied room 28 of the Villa Inn Motel. Mid-morning on October 3, the Las Vegas police received a telephone call from an anonymous tipster, later determined to be Magee. Magee stated that three White men with whom he was not acquainted were staying in room 28 of the Vista Inn Motel; he said he had overheard a conversation among the men, and believed that they were implicated in the murder of a sailor in San Diego, had a small white car that had been stolen, and were trying to sell some guns; he stated that as he was speaking two of the men—both of whom evidently had scraggly beards and wore red bandanas—were in the parking lot changing a tire on the car, and that the third was in the motel room.

Officer De Hoedt and his partner, Officer Timothy Burris, received a radio broadcast describing an overheard conversation among three men who were talking about a shooting incident in California. Officer Schultz and his partner, Officer Michael Karstedt, also received a broadcast about an anonymous tip concerning a California murder, a stolen car, and possible disposal of the murder weapon. Detective McGuckin learned of the anonymous telephone call while in his office. These five police officers were dispatched to the Vista Motel.

Meanwhile, Magee called a second time. He stated that the two men in the parking lot had just driven off, but he believed the third was still in the motel room; he said the car was similar to a hatchback and bore Florida license plates, and added that the trio had two guns; he admitted he was acquainted with the men, but denied involvement in any crimes; he corrected himself and said the motel in question was the Villa Inn, not the Vista Inn; and he stated his belief that the men used drugs and were "crazy."

When the officers who had gone to the Vista Motel called the police department for additional information, they were told that the tipster had made a mistake and were then directed to proceed to the Villa Inn. As soon as Detective McGuckin and Officer Schultz arrived, they went to the manager's office and obtained the registration card for room 28. The card bore Steeg's name and a California address. McGuckin and Schultz soon met the three other officers at the foot of the stairs leading to the second floor, on which room 28 was located. Apparently just before or just after this meeting, one of the officers approached a telephone booth from which Magee was making his second call to the police operator. The officer asked whether he was talking to a policewoman; not wanting to get involved, Magee answered "no" and the officer walked away. The police operator, however, apparently radioed the officers and informed them that the man was indeed the tipster.

The officers proceeded up the stairs to room 28. At the door they took up positions and at least three drew their weapons. De Hoedt knocked, "announced that there were police officers present and for the door to be opened." Finckel opened the door and the officers immediately entered, without a warrant and without consent. Schultz patted Finckel down for weapons and other officers searched Finckel's immediate area for weapons and the room itself for the other suspects. Finckel was placed on the bed. One of the officers found some ammunition in a dresser drawer, but neither McGuckin nor De Hoedt nor Schultz could remember whether the drawer was open on their arrival and, if not, who opened it. The officers then holstered their guns.

At that time, according to Schultz and McGuckin, Schultz advised Finckel of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; Finckel, however, denied receiving any advisement. McGuckin then questioned him on matters including the following: his identity; the identity of his companions; what they looked like; where they were; what they were doing; when they would return; whether the car was stolen; and whether he had any information about a killing in California. In response, Finckel stated that his companions were both White males, had very scraggly beards, and wore red bandanas; they were driving someone home and were expected back shortly; and the car was indeed stolen.

Detective McGuckin explained to Finckel the purpose of their entry and subsequent actions. "Well, I didn't go into any great amount of detail. It was a case of 'We're here because we've got information that there was a murder or a killing that went down in Southern California; that it was overheard that there was persons supposed to be in this room that have weapons and they're planning to dispose of the weapons.'"

This was essentially the same explanation—viz., to confirm the tip—that McGuckin also gave to the court: "Basically what it was, we had a certain amount of information that we got from the anonymous phone caller. I was looking for some kind of corroboration from Mr. Finckel as to corroborating this informant, and also, trying to determine in my own mind was he or was he not part of this thing."

Even though Finckel had been forcibly restrained against the wall, searched, apparently given *Miranda* warnings, and placed on a bed in the small motel room, Detective McGuckin considered Finckel to be merely a witness and not a suspect. Finckel was not handcuffed in the motel room nor was he placed under formal arrest. According to McGuckin, Finckel was not told he was free to leave the motel room because Finckel "never

asked." Finckel testified that on the basis of the officers' abrupt armed entry he believed he was not free to leave.

Officers De Hoedt and Burris left room 28 to set up surveillance of the parking lot and await the return of the two men in the car. As they were leaving the north parking lot area in their patrol car they observed a parked car resembling the vehicle they were looking for. After making a U-turn to investigate, they caught sight of a white compact car with Florida license plates approaching them down an alley. As they passed this car, De Hoedt saw two White males with very scraggly beards and red bandanas. He believed these men matched the description obtained from both Finckel and the tipster.

Concluding, in De Hoedt's words, "it was possibly the suspect vehicle," De Hoedt and Burris pulled in behind the car and signaled it to stop with their red light. Simultaneously, De Hoedt reported to the dispatcher their action and the license number. After the car stopped, De Hoedt and Burris left their vehicle, De Hoedt armed with a shotgun and Burris with his revolver. Based on information received from Finckel, they believed the occupants of the car possessed firearms and that one gun was in the glove compartment, the other underneath a seat. With Burris providing cover, De Hoedt then approached the vehicle, pointing his shotgun at the car's occupants. On being ordered out, defendant got out of the passenger's seat and Steeg slowly emerged from the driver's seat. The officers instructed each man to put his hands on a rear quarter panel of the car and spread his feet; they then patted each down for weapons and found a knife on Steeg. Thereupon they handcuffed both and gave them *Miranda* warnings.

In plain view, Officer De Hoedt saw a brown leather container, which appeared to him to be a gun case, lying on the floorboard before the driver's seat. He picked the case up, felt it, concluded it might contain a gun, unzipped it, and found a revolver—which turned out to be the murder weapon. He then placed the case back inside the car on the driver's seat.

Officer Burris received word from the radio dispatcher that a check with the National Crime Information Center revealed the suspect vehicle had been reported stolen from a homicide victim in National City, and relayed this information to De Hoedt. From the stop of the car to the receipt of the information between 10 to 15 minutes had elapsed.

As these events were taking place, Detective McGuckin took Finckel from the motel room and placed him in the front seat of his car in preparation for a trip to the police station for further questioning. McGuckin testified that Finckel was not handcuffed and was being treated as a witness.

As they drove toward the suspect vehicle, Finckel said, "That's them. Don't let them see me." After McGuckin had been informed of the results of the vehicle stop, he decided that defendant and Steeg should be taken to the police station for booking; De Hoedt and Burris drove them there.

While still at the location of the vehicle stop, Detective McGuckin obtained Finckel's signature on a consent-to-search form covering the motel room. Because of his dyslexia Finckel was unable to read the form, but he signed it after McGuckin read it aloud and explained it to him. Finckel testified that he signed voluntarily because he thought cooperating with the police would be a good idea. He was driven to the police station sitting handcuffed in the back seat. It is unclear whether Finckel signed the form while he sat unrestrained in the front seat or handcuffed in the back.

Officers Schultz and Karstedt stationed themselves at the scene of the vehicle stop and secured the car. A police identification specialist soon arrived. Without a warrant, she took photographs of the car and removed the brown leather case and its contents—the murder weapon. She then went to room 28, entered under the authority of Finckel's consent, and seized a brown plastic bag in which a motel employee had put various items apparently belonging to defendant, Steeg, and Finckel, including four .38-caliber cartridges.

Later on October 3, the Las Vegas police notified the National City Police Department of the preceding events. The National City police requested that the motel room and the stolen car be secured; they assigned Captain Wayne Fowler and Sergeant Merrell Davis to the case and dispatched them to Las Vegas. Fowler and Davis drove to Las Vegas, arriving between 6:30 and 7 p.m., and were briefed by Detective McGuckin. From that point on the National City police were in charge of the investigation and the Las Vegas police merely assisted.

That night, Captain Fowler and Sergeant Davis interviewed Magee, Cowen, Finckel, Steeg, and defendant. Magee was questioned first. He was not under arrest and was not given any *Miranda* warnings. Fowler told him "if [he] felt [Fowler] should advise him of his constitutional rights, that he should tell [Fowler] so because [Fowler] did not know where the conversation was going to lead." Magee agreed to go back to California for additional questioning after his interview.

Cowen was interviewed next. She admitted purchasing a suitcase full of items from defendant, Steeg, and Finckel, and stated that the suitcase was located in room 32 at the Villa Inn. Once she learned this property might be connected with a murder, she agreed to turn it over to the police.

Finckel was then interviewed. He had spent the entire day handcuffed to a bar in the interview room, waiting for the National City police to arrive. As he had done with Magee, Captain Fowler prefaced the interview with a statement that if Finckel felt Fowler should advise him of his constitutional rights he should say so. Finckel's statements were summarized in a search warrant affidavit executed the next day. The body of the affidavit appears in the margin.[1]

---

[1] "On the morning of Wednesday, September 30th, 1981, the body of a sailor named Gregory Lock was found on a roadside in National City, California. National City is adjacent to, and just south of San Diego. Lock had been shot five times in the back. Three bullets were recovered from the body; and, according to the Medical Examiner, were consistent with a .38-caliber.

"Lock had apparently been robbed, as his wallet which contained a Visa credit card issued in his name by the Navy Federal Credit Union and other identification was missing. Lock's car keys and his car, which he had been known to be driving the evening before, were also taken. The car is a white 1978 Oldsmobile Starfire hatchback with Florida license number FBN169. Only one piece of identification was found on Lock's body—his military identification card.

"On Saturday, October 3rd, 1981, the Las Vegas Metropolitan Police received information from an anonymous caller that two subjects who had spoken of committing a murder in California were in Las Vegas driving a stolen white compact car with a hatchback bearing Florida license plates. The caller said the subjects were staying in room #28 of a motel which was determined by the police dispatcher to be the Villa Inn Motel at 225 Las Vegas Boulevard, South.

"Police officers were dispatched to the motel and knocked on the door of Room #28. A subject later identified as Kevin Finckel opened the door. Finckel was advised of his Miranda Rights and agreed to speak to the officers about the information they had received.

"Finckel stated that he had been traveling for the last three days with the two subjects the officers were seeking. Finckel related that two subjects whom he knew in San Diego, Michael Brandon [i.e., defendant] and Norman Steeg, had picked him up while he was hitchhiking in San Diego on Thursday, October 1st, 1981. Steeg and Brandon were driving a small white car with Florida license plates. Finckel traveled with Steeg and Brandon to Las Vegas in the car and was staying with them at the Villa Inn Motel. A check of the room registration by the officers revealed that the room had been rented to Steeg.

"During the course of his travel with Steeg and Brandon over the last three days, he had been told the following details of the killing which he related to the officers: The man killed had been in the military, had been shot in the back with a handgun at least three times, that they had left one piece of identification on the victim after the killing, that they had taken the victim's wallet, car keys, and car after the killing, and that the car they were driving was the one taken from the victim.

"Finckel stated that Steeg and Brandon were out in the car at the time, and he supplied the officers with physical descriptions of both subjects. A few minutes later both subjects were arrested in the car belonging to the victim, as they drove down the alley behind the motel. After the subjects had been ordered from the car, an officer saw in plain view a pistol case in the car which was then seized and found to contain a .38-caliber handgun. A search of the car was not made. It has been sealed and towed to the Las Vegas Metropolitan Police Department Crime Lab Yard located at 2575 South Highland Boulevard. The motel room, #28, at the Villa Inn Motel has not been searched.

"Finckel stated that while he was staying in the motel room with Steeg and Brandon the .38-caliber handgun had been produced and accidently discharged by Brandon in the room. Finckel stated that the bullet had been recovered and was still in Room #28 of the Villa Inn Motel, which is a two-story stucco structure located at 225 Las Vegas Boulevard, South, with

Captain Fowler then sought to question Steeg. Steeg, however, requested an attorney and invoked his *Miranda* rights. Fowler then told him there would be an extradition hearing on Monday, October 5, and asked him whether he would waive extradition.

Defendant was interviewed last. He had evidently been advised of his *Miranda* rights by the Las Vegas police, had responded to some questions, but then had declined to give further answers. Informed of the preceding facts, Sergeant Davis asked whether he would waive extradition because any decision on his part would affect the officers' transportation plans. Defendant answered in the affirmative.

On Sunday, October 4, Detective David Hatch of the Las Vegas police was assigned to assist the National City officers in obtaining a search warrant. Using information obtained directly from the National City officers and Detective McGuckin's arrest report and ultimately in large part from Finckel, Detective Hatch prepared the search warrant affidavit quoted above (*ante,* fn. 1), and a warrant issued for a search of the motel room and the stolen car. The searches were conducted on the same day and yielded, from the vehicle, what proved to be Beardsley's .38-caliber revolver, a man's digital wristwatch, ammunition and other items, and from a garbage container located in room 28, one bullet.

During the course of an interview conducted by the National City police, apparently on October 6, Finckel stated that evidence relating to the killing might be found in the backyard of Plaski's house. The ensuing search of that location revealed a grassy area that appeared to have been burned, two .38-caliber cartridges, a burnt wallet, and pieces of burnt paper that bore the words "Gregory" and "Union."

While the suppression hearing was being conducted, the defense petitioned the Nevada Supreme Court for a writ of mandate in the proceedings to enforce the San Diego Superior Court's certificate to compel attendance of out-of-state witnesses. Judge Reed denied a defense request for a continuance of the hearing until the Nevada Supreme Court made a decision on the petition, but ruled that "to the extent your petition before the Nevada Supreme Court might alter the testimony or the evidence you would have presented at the 1538.5 hearing had [the] writ in Nevada been completed, this matter I would find, could be reopened for that limited purpose."

---

signs giving the name of the business at both the front and the rear of the property. Room #28 is located on the upper level of the south side of the building. The door of the room is green in color with the number '28' clearly marked on the door in white numerals."

After evidence and argument were presented at the hearing, Judge Reed denied the motion to suppress. In so ruling, she made, among others, the following determinations.

"With respect to the applicable law, whether California or Nevada law should be applied as to these proceedings, or federal law, . . . I find that with respect to the initial entry into room 28, the stop of the automobile and the items which occurred before the arrival and participation of the National City police officers, would be governed by Nevada or federal law, as the case may be. That, to the extent that the National City police officers participated in the affidavit for the search warrant and the execution of the search warrant, that California law would probably control . . . .

"With respect to the initial entry into room 28, there is the standing question as to both Steeg and Williams . . . . There was, however, a possessory right in each of them to the motel room, and they each would have their own constitutional rights to privacy. . . . I will hold . . . that both Mr. Steeg and Mr. Williams have standing on this issue, that is, the initial entry into room 28.

"With respect to the initial entry, the finding is that the conduct of the police officers up to the point in time at which they detained Mr. Finckel, was appropriate and reasonable. The officers at the time that they approached room 28 had cause to investigate information relating to a homicide in California. . . . [¶] I find the officers did knock, notified the occupant, if any, that they were police officers, and that it was not unreasonable for their guns to be drawn under the circumstances, having been notified that the probable occupant of the room may have been involved in a homicide, might have been armed. [¶] I find that the conduct relating to Finckel in room 28 before he left that room with the officers amounted to a detention. . . . [¶] The testimony here further, to my mind, established that Mr. Finckel felt that he had a choice and exercised that choice to give the officers permission to search; that he spoke to the officers not under compulsion but rather voluntarily . . . .

". . . . . . . . . . . . . . . . .

"And, then, that the stop of that vehicle was appropriate and reasonable. . . . [¶] The officers examined, that is, took out of the vehicle and examined a container: a small brown leather bag. . . . I find that that was appropriate conduct; that the bag was in plain view. [¶] If I haven't said it before, I do find that the consent of Finckel to search room 28 was freely given."

Defendant and Steeg were then tried separately. After defendant had been convicted and sentenced and after Steeg had been convicted but not yet sentenced, the Nevada Supreme Court granted the petition for writ of mandate and ordered the Eighth Judicial District Court to issue a summons to each of the five police officers who had not previously been compelled to appear.

The defense renewed its motion, seeking to suppress Finckel's testimony as well as the evidence it had specified originally. Despite the prosecution's expressed doubt that the court had jurisdiction to reconsider the motion, Judge Reed ordered the hearing reopened so that she could receive the testimony of the officers who had not previously appeared.

Again only the defense called witnesses. These included Michael Karstedt, who was Officer Schultz's partner, and Timothy Burris, who was Officer De Hoedt's partner. In substance, their testimony was not inconsistent with that given at the initial hearing by Detective McGuckin and Officers De Hoedt and Schultz. On a few points, however, it conflicted or provided additional information.

Karstedt testified that at the motel manager's office McGuckin and Schultz obtained the key to room 28; all the officers had their guns drawn when they entered the room; Finckel was handcuffed immediately after the patdown search; Schultz then advised Finckel of his *Miranda* rights, but Karstedt could not recall whether Schultz or anyone else asked if he was willing to waive his rights and talk to the police; Burris opened the dresser drawer in which the ammunition was found.

Burris confirmed that all the officers entered the room with their guns drawn and that he did in fact open the drawer; he stated further that he considered defendant and Steeg under arrest as soon as they were handcuffed. Over defendant's objection, Karstedt stated on cross-examination that he would have stopped the suspect car even if he had had only the information provided by the tipster.

Judge Reed again denied the motion to suppress, stating: "I find that my ruling is unchanged . . . ." She also denied a request by the defense for findings.

2

The substantive law applicable to the case at bench is well settled. The Fourth Amendment to the Constitution of the United States, made applicable to the states by the Fourteenth Amendment (*Mapp* v. *Ohio* (1961) 367

U.S. 643, 643-660 [6 L.Ed.2d 1081, 1083-1093, 81 S.Ct. 1684, 84 A.L.R.2d 933]; *Wolf* v. *Colorado* (1949) 338 U.S. 25, 27-28 [93 L.Ed. 1782, 1785-1786, 69 S.Ct. 1359]), provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." ■ Under the amendment, a warrantless entry by the police into a residence is at least presumptively unreasonable and therefore unlawful. (E.g., *Welsh* v. *Wisconsin* (1984) 466 U.S. 740, 748-749 [80 L.Ed.2d 732, 742-743, 104 S.Ct. 2091]; *Payton* v. *New York* (1980) 445 U.S. 573, 583-590 [63 L.Ed.2d 639, 648-653, 100 S.Ct. 1371]; *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 474-475 [29 L.Ed.2d 564, 587-588, 91 S.Ct. 2022]; *McDonald* v. *United States* (1948) 335 U.S. 451, 453-456 [93 L.Ed. 153, 157-159, 69 S.Ct. 191]; *People* v. *Ramey* (1976) 16 Cal.3d 263, 270-276 [127 Cal.Rptr. 629, 545 P.2d 1333]; *People* v. *Dumas* (1973) 9 Cal.3d 871, 882 [109 Cal.Rptr. 304, 512 P.2d 1208].)[2]

The rule applies whether the entry is made to search for evidence (e.g., *Coolidge* v. *New Hampshire, supra,* 403 U.S. at pp. 453-455 [29 L.Ed.2d at pp. 575-576]; *McDonald* v. *United States, supra,* 335 U.S. at p. 453 [93 L.Ed. at p. 157]; *People* v. *Dumas, supra,* 9 Cal.3d at p. 882) or to seize a person (e.g., *Welsh* v. *Wisconsin, supra,* 466 U.S. at pp. 748-749 [80 L.Ed.2d at pp. 742-743]; *Payton* v. *New York, supra,* 445 U.S. at pp. 583-590 [63 L.Ed.2d at pp. 648-653]; *People* v. *Ramey, supra,* 16 Cal.3d at pp. 270-276). It applies no less when, as here, the dwelling entered is a guest room in a hotel or motel. (E.g., *Stoner* v. *California* (1964) 376 U.S. 483, 488-490 [11 L.Ed.2d 856, 860-861, 84 S.Ct. 889] [entry to search for evidence]; *People* v. *Dumas, supra,* at p. 882, fn. 8 [same]; *United States* v. *Baldacchino* (1st Cir. 1985) 762 F.2d 170, 175-176 [entry to seize a person]; *United States* v. *Bulman* (11th Cir. 1982) 667 F.2d 1374, 1382-1384, cert. den. 456 U.S. 1010 [73 L.Ed.2d 1307, 102 S.Ct. 2305] [same].)

■ When exigent circumstances are present, however, failure to comply with the warrant requirement is not fatal. (E.g., *Welsh* v. *Wisconsin, supra,*

---

[2] Because of the conclusion we reach in this case, we have no occasion to consider whether the Fourth Amendment may impose an absolute ban on the warrantless entry of a residence for the purpose of investigation when the facts warrant detention only. We observe, however, that since as a general matter the warrantless entry into a residence is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence or the suspected perpetrator will be found within (e.g., *Payton* v. *New York, supra,* 445 U.S. at pp. 588-589 [63 L.Ed.2d at p. 652] [entry to seize a person]; *Jones* v. *United States* (1958) 357 U.S. 493, 497-498 [2 L.Ed.2d 1514, 78 S.Ct. 1253] [entry to search for evidence]), a serious question exists whether the warrantless entry into a residence is permissible under any circumstances when its sole justification is the "reasonable suspicion" that supports detention under *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], and its progeny.

466 U.S. at pp. 749-750 [80 L.Ed.2d at p. 743] [entry to seize a person]; *Payton* v. *New York, supra,* 445 U.S. at pp. 585-590 [63 L.Ed.2d at pp. 650-653] [same]; Coolidge v. *New Hampshire, supra,* 403 U.S. at pp. 474-475, 477-478 [29 L.Ed.2d at pp. 587-590] [entry to search for evidence]; *Vale* v. *Louisiana* (1970) 399 U.S. 30, 34 [26 L.Ed.2d 409, 413, 90 S.Ct. 1969] [same]; *People* v. *Ramey, supra,* 16 Cal.3d at pp. 270-277 [entry to seize a person]; *People* v. *Dumas, supra,* 9 Cal.3d at pp. 881-886 [entry to search for evidence].)

It is manifest, however, that "exceptions to the warrant requirement [under the exigent-circumstance rubric] are 'few in number and carefully delineated'. . . ." (*Welsh* v. *Wisconsin, supra,* 466 U.S. at p. 749 [80 L.Ed.2d at p. 743] [entry to seize a person]; accord, *Vale* v. *Louisiana, supra,* 399 U.S. at p. 34 [26 L.Ed.2d at p. 413] [entry to search for evidence]; see, e.g., *People* v. *Ramey, supra,* 16 Cal.3d at pp. 270-277 [entry to seize a person]; *People* v. *Dumas, supra,* 9 Cal.3d at p. 882 [entry to search for evidence].)

Only two exceptions are potentially applicable on the facts of the case before us: the hot pursuit of a fleeing felon (*United States* v. *Santana* (1976) 427 U.S. 38, 42-43 [49 L.Ed.2d 300, 305-306, 96 S.Ct. 2406]; *Warden* v. *Hayden* (1967) 387 U.S. 294, 298-299 [18 L.Ed.2d 782, 787-788, 87 S.Ct. 1642]), and the prevention of the imminent destruction or removal of evidence (*Vale* v. *Louisiana, supra,* 399 U.S. at p. 35 [26 L.Ed.2d at p. 414] [dictum]). The United States Supreme Court, however, has made it plain that each of these two exceptions must be narrowly construed. The former requires an "immediate or continuous pursuit of the [felon] from the scene of a crime." (*Welsh* v. *Wisconsin, supra,* 466 U.S. at p. 753 [80 L.Ed.2d at p. 745].) The latter requires that the threatened destruction be imminent. (See *Vale* v. *Louisiana, supra,* at p. 35 [26 L.Ed.2d at p. 414]; *United States* v. *Jeffers* (1951) 342 U.S. 48, 52 [96 L.Ed. 59, 64-65, 72 S.Ct. 93]; *McDonald* v. *United States, supra,* 335 U.S. at pp. 454-455 [93 L.Ed. at pp. 157-158]; *Johnson* v. *United States* (1948) 333 U.S. 10, 14-15 [92 L.Ed. 436, 440-441, 68 S.Ct. 367].)

 Turning from the question of the lawfulness of a warrantless entry into a residence to that of the reasonableness of an investigative stop, we observe that "In *Terry* [v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868],] and subsequent cases, [the United States Supreme] Court has held that, consistent with the Fourth Amendment, police may stop persons in the absence of probable cause under limited circumstances." (*United States* v. *Hensley* (1985) 469 U.S. 221, 226 [83 L.Ed.2d 604, 610, 105 S.Ct. 675].) In a factual context similar to the case at bar, the high court has concluded that "if police have a reasonable suspicion, grounded in specific and articul-

able facts, that a person they encounter was involved in or wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." (*Id*. at p. 229 [83 L.Ed.2d at p. 612].) When the police make such a stop, "they [are] authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." (*Id*. at p. 235 [83 L.Ed.2d at p. 616].) Further, having made the stop, they "[are] entitled to seize evidence revealed in plain view in the course of the lawful stop . . . ." (*Ibid*.)

█ If the challenged police conduct is shown to be violative of the Fourth Amendment, the exclusionary rule requires that all evidence obtained as a result of such conduct be suppressed. (E.g., *Mapp* v. *Ohio, supra,* 367 U.S. at pp. 646-660 [6 L.Ed.2d at pp. 1085-1093]; *Silverthorne Lumber Co.* v. *United States* (1920) 251 U.S. 385, 390-392 [64 L.Ed. 319, 321-322, 40 S.Ct. 182, 24 A.L.R. 1426]; *Weeks* v. *United States* (1914) 232 U.S. 383, 389-398 [58 L.Ed. 652, 654-658, 34 S.Ct. 341]; *People* v. *Cahan* (1955) 44 Cal.2d 434, 445-450 [282 P.2d 905, 50 A.L.R.2d 513].)

Such evidence includes not only what was seized in the course of the unlawful conduct itself—the so-called "primary" evidence (e.g., *Davis* v. *Mississippi* (1969) 394 U.S. 721, 723-724 [22 L.Ed.2d 676, 679, 89 S.Ct. 1394]; *Mapp* v. *Ohio, supra,* 367 U.S. at pp. 646-660 [6 L.Ed.2d at pp. 1085-1093]; *Elkins* v. *United States* (1960) 364 U.S. 206, 208-223 [4 L.Ed.2d 1669, 1672-1681, 80 S.Ct. 1437])—but also what was subsequently obtained through the information gained by the police in the course of such conduct—the so-called "derivative" or "secondary" evidence (e.g., *Alderman* v. *United States* (1969) 394 U.S. 165, 171 [22 L.Ed.2d 176, 185, 89 S.Ct. 961]; *Wong Sun* v. *United States* (1963) 371 U.S. 471, 484-487 [9 L.Ed.2d 441, 453-455, 83 S.Ct. 407]; *Nardone* v. *United States* (1939) 308 U.S. 338, 340-341 [84 L.Ed. 307, 311-312, 60 S.Ct. 266]; *Silverthorne Lumber Co.* v. *United States, supra,* 251 U.S. at p. 392 [64 L.Ed.2d at pp. 321-322]; see, e.g., *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 763 [44 Cal.Rptr. 313, 401 P.2d 921]). Thus, the "fruit of the poisonous tree," as well as the tree itself, must be excluded. (*Nardone* v. *United States, supra,* at p. 341 [84 L.Ed.2d at pp. 311-312].)

Once the challenged police conduct is shown to be unlawful, the primary evidence is automatically subject to suppression. (E.g., *Davis* v. *Mississippi, supra,* 394 U.S. at pp. 723-724 [22 L.Ed.2d at p. 679]; *Mapp* v. *Ohio, supra,* 367 U.S. at pp. 646-660 [6 L.Ed.2d at pp. 1085-1093]; *Elkins* v. *United States, supra,* 364 U.S. at pp. 208-223 [4 L.Ed.2d at pp. 1672-1681]; *Weeks* v. *United States, supra,* 232 U.S. at pp. 386-398 [58 L.Ed.2d at pp. 653-658].) Secondary evidence, by contrast, is excluded only if it is "tainted" by the unlawful conduct. (E.g., *Nardone* v. *United States, supra,* 308 U.S. at

p. 341 [84 L.Ed.2d at pp. 311-312]; see, e.g., *People* v. *Stoner* (1967) 65 Cal.2d 595, 598 [55 Cal.Rptr. 897, 422 P.2d 585].)

The law on the evidentiary burdens to which the parties are subject is as well settled as the applicable substantive law. The defendant bears the burden of showing that the police officers acted unlawfully. (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23] [warrantless arrest, entry, or search].) When the defendant has shown a warrantless entry, the burden shifts to the prosecution to prove that the entry was nevertheless reasonable. (*Ibid.*; see, e.g., *Welsh* v. *Wisconsin, supra,* 466 U.S. at pp. 749-750 [80 L.Ed.2d at p. 743] [entry to seize a person]; *Coolidge* v. *New Hampshire, supra,* 403 U.S. at pp. 474-475 [29 L.Ed.2d at pp. 587-588] [entry to search for evidence]; *Vale* v. *Louisiana, supra,* 399 U.S. at p. 34 [26 L.Ed.2d at p. 413] [same]; *People* v. *Ramey, supra,* 16 Cal.3d at pp. 270-277 [entry to seize a person]; *People* v. *Dumas, supra,* 9 Cal.3d at p. 881 [entry to search for evidence].) The prosecution must show, for example, the presence of exigent circumstances—a burden that is heavy indeed. (*Welsh* v. *Wisconsin, supra,* at pp. 749-750 [80 L.Ed.2d at p. 743] [entry to seize a person]; accord, *Vale* v. *Louisiana, supra,* at p. 34 [26 L.Ed.2d at p. 413] [entry to search for evidence]; see, e.g., *People* v. *Ramey, supra,* at pp. 270-277 [entry to seize a person]; *People* v. *Dumas, supra,* at pp. 881-882 [entry to search for evidence].)

 If the prosecution fails to carry its burden, the defendant need do nothing more to be entitled to suppression of the primary evidence: such evidence, as we have stated, is automatically subject to suppression. As for secondary evidence, the defendant bears the burden of making a prima facie case that such evidence was "tainted" by—i.e., causally linked to—the primary illegality. (E.g., *Alderman* v. *United States, supra,* 394 U.S. at p. 183 [22 L.Ed.2d at p. 192]; *Nardone* v. *United States, supra,* 308 U.S. at p. 341 [84 L.Ed.2d at pp. 311-312]; *People* v. *Coleman* (1975) 13 Cal.3d 867, 890-891, fn. 20 [120 Cal.Rptr. 384, 533 P.2d 1024]; *People* v. *Johnson* (1969) 70 Cal.2d 541, 554 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366].) This burden also is heavy. He must show more than that the challenged evidence "would not have come to light *but for* the illegal actions of the police"; rather, he must establish that it " 'has been come at by *exploitation* of that illegality . . . .' " (*Wong Sun* v. *United States, supra,* 371 U.S. at p. 488 [9 L.Ed.2d at p. 455], italics added.) If the defendant makes this showing, the burden shifts to the prosecution to prove that the taint has been "purged" and hence that the evidence is admissible in spite of the primary illegality. (E.g., *Alderman* v. *United States, supra,* 394 U.S. at p. 183 [22 L.Ed.2d at p. 192]; *Nardone* v. *United States, supra,* 308 U.S. at p. 341 [84 L.Ed.2d at pp. 311-312]; *People* v. *Coleman, supra,* 13 Cal.3d at p. 891, fn. 20; *People* v. *Johnson, supra,* 70 Cal.2d at p. 554.)

3

An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. (*People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436]; see generally *People* v. *Louis* (1986) 42 Cal.3d 969, 984-987 [232 Cal.Rptr. 110, 728 P.2d 180] [discussing standards of review and underlying policies in detail].)

■ In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. (*People* v. *Louis, supra,* 42 Cal.3d at p. 985; see *People* v. *Loewen, supra,* 35 Cal.3d at p. 123.) "The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review." (*People* v. *Louis, supra,* at p. 985; see *People* v. *Loewen, supra,* at p. 123.)

The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. (*People* v. *Loewen, supra,* 35 Cal.3d at p. 123; accord, *People* v. *Louis, supra,* 42 Cal.3d at p. 985.) Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. (*People* v. *Loewen, supra,* at p. 123; accord, *People* v. *Louis, supra,* at p. 985.) Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, viz., the reasonableness of the challenged police conduct, is also subject to independent review. (See *People* v. *Loewen, supra,* at p. 123 [referring to reasonableness as a "question of law" but impliedly recognizing it to be a mixed fact-law question]; accord, *People* v. *Louis, supra,* at pp. 986-987.) The reason is plain: "it is 'the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness.' " (*People* v. *Loewen, supra,* at p. 123.)

4

Turning to the case at bar, we review the court's denial of the motion to suppress under the foregoing principles. We conclude, for the reasons given below, that the ruling must be upheld.

■ It was undisputed, and Judge Reed impliedly found, that the officers entered room 28 without a warrant. We accept this finding as supported by substantial evidence.

Judge Reed also impliedly found that there were exigent circumstances to justify the warrantless entry. After independent review, we are compelled to reject this determination.

First, the record contains no facts that would support the conclusion that the entry was such as to fall within the only two narrow exigent circumstances recognized by the United States Supreme Court and potentially available here—nor does the Attorney General contend otherwise. There are no facts establishing that the entry was made to press an immediate or continuous pursuit of a felon fleeing from the scene of the crime. (*Welsh* v. *Wisconsin, supra,* 466 U.S. at p. 753 [80 L.Ed.2d at p. 745].) Nor are there any facts showing the police entered to prevent the imminent destruction or removal of crucial evidence. (*See Vale* v. *Louisiana, supra,* 399 U.S. at p. 35 [26 L.Ed.2d at p. 414]; *United States* v. *Jeffers, supra,* 342 U.S. at p. 52 [96 L.Ed.2d at pp. 64-65]; *McDonald* v. *United States, supra,* 335 U.S. at pp. 454-455 [93 L.Ed.2d at pp. 157-158]; *Johnson* v. *United States, supra,* 333 U.S. at pp. 14-15 [994 L.Ed.2d at pp. 440-441]). Just as Finckel could not remove himself from the room without encountering the police, so too he could not remove the gun. Nor, plainly, could he quickly destroy it or cause it to disappear, as though it were a substance that could be dissolved or flushed down the plumbing. Quite the contrary: the record plainly shows that the police were not engaged in a hot pursuit, and had no grounds to believe—and evidently did not believe—that destruction of crucial evidence would imminently take place unless they entered room 28 when and how they did.

Second, and perhaps more important, the police made their warrantless entry into room 28, as the record establishes beyond the least dispute, not in response to such an exigency as the destruction of evidence or the escape of a felon or the threat of harm to the officers themselves or to others, and not even in response to what they *believed* to be such an exigency. Rather, they entered solely and simply to seek corroboration of the tip. As Detective McGuckin candidly testified: "Basically what it was, we had a certain amount of information that we got from the anonymous phone caller. I was looking for some kind of corroboration from Mr. Finckel as to corroborating this informant, and also, trying to determine in my own mind was he or was he not part of this thing." Whatever demand the situation made on the officers manifestly did not rise to the level of an exigency sufficiently pressing to excuse the violation of a person's right to privacy in his dwelling.

 Judge Reed expressly concluded that "the stop of [the] vehicle was appropriate and reasonable," and that the examination and opening of the gun case was "appropriate conduct . . . ." After independent review, we accept these determinations.

First, the record plainly shows that the detailed information supplied by Magee raised in the police "a reasonable suspicion, grounded in specific and articulable facts, that [each of the occupants of the automobile] . . . was

involved in or is wanted in connection with a completed felony . . . ." (*United States* v. *Hensley, supra,* 469 U.S. at p. 229 [83 L.Ed.2d at p. 612].) Because the police lawfully obtained information from Magee sufficient to justify the stop and the incidental seizure of car and gun case before they made their unlawful entry into room 28, the stop and seizure were lawful. (*United States* v. *Marchand* (2d Cir. 1977) 564 F.2d 983, 1001-1002 (per curiam), cert. den. (1978) 434 U.S. 1015 [54 L.Ed.2d 760, 98 S.Ct. 732] [arrest].) Second, the police were authorized to open the gun case—a step that on the facts here was "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." (*United States* v. *Hensley, supra,* at p. 235 [83 L.Ed.2d at p. 615] [opening of rolled-up jacket, lying on automobile's front seat, found to contain a handgun].)

■ The warrant authorizing the searches of the car and the motel room was also valid and the evidence seized during those searches—including Beardsley's .38-caliber revolver, ammunition, the digital wristwatch, and the bullet—was properly ruled admissible. It is the general rule that if probable cause clearly remains after tainted information is excised from the affidavit, a warrant is still valid. (E.g., *Grimaldi* v. *United States* (1st Cir. 1979) 606 F.2d 332, 336, cert. den. 444 U.S. 971 [62 L.Ed.2d 386, 100 S.Ct. 465]; cf. *Franks* v. *Delaware* (1978) 438 U.S. 154, 155-156, 171-172 [57 L.Ed.2d 667, 672, 682, 98 S.Ct. 2674] [if statements in the affidavit challenged as false are not material to a showing of probable cause, the warrant is valid].) Here—even assuming the narrative furnished by Finckel was tainted—information furnished by Magee and the National City police, which supports probable cause, clearly remains.

■ On the issue whether the officers' unlawful entry into room 28 tainted the other evidence sought to be suppressed—notably Finckel's testimony for the prosecution—there is no finding either express or implied. After an independent review of the undisputed facts we conclude that defendant failed to make a prima facie case that the evidence sought to be suppressed was tainted by the unlawful police entry into room 28. We seriously doubt he succeeded even in making the requisite showing that but for the primary illegality the evidence would not have been obtained. Specifically, he introduced scant evidence to show that in the absence of the unlawful entry the police would not have lawfully seized Finckel; indeed, the officers had Finckel's description, were at his door, and had information sufficient to warrant at least an investigative stop. Moreover, defendant presented little if any evidence to demonstrate that without the unlawful entry Finckel would not have talked to the police or agreed to testify for the prosecution; on the contrary, from the very beginning Finckel voluntarily cooperated with the authorities in the evident hope of receiving better treatment. But even assuming arguendo that defendant did manage to make

a prima facie case of "but for" causality, such a showing, as we have observed, is simply not enough. (*Wong Sun* v. *United States, supra,* 371 U.S. at p. 488 [9 L.Ed.2d at pp. 455-456].) He simply failed to establish that the challenged evidence " 'ha[d] been come at by exploitation of that illegality . . . .' " (*Ibid.*)

 ██ For the foregoing reasons we conclude that the denial of defendant's motion to suppress was not error.[3]

## B

 Defendant contends as follows: Sergeant Davis violated his rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436, when, knowing he had earlier invoked his right to remain silent, he asked whether he would waive extradition; this action rendered his subsequent formal waiver involuntary; and hence all charges against him should be dismissed or at least the statements he allegedly made to the two jailhouse informants should be suppressed. He is unpersuasive.

---

[3] Defendant makes several additional claims relating to the motion to suppress. He first maintains that the court erred in ruling Nevada law was applicable to the facts of the case. But even if the court did err, no prejudice ensued: defendant fails to show that Nevada law and California law are materially different insofar as the issues in this case are concerned.

Defendant next argues that the court erred in determining that the Las Vegas police officers did not violate the Nevada knock-notice statutes (Nev.Rev.Stats., §§ 171.138, 179.055(1)). Because we have concluded the entry into room 28 was unlawful, the point is immaterial.

Defendant also urges that the court erred in refusing to follow the *Wilder* procedure (*Wilder* v. *Superior Court, supra,* 92 Cal.App.3d 90). Any error in this regard, however, was plainly harmless. Crucial to the success of the suppression motion here was proof of taint. The court's ruling on defendant's *Wilder* motion simply had no effect on this issue—nor does defendant contend otherwise.

Defendant next maintains that the court abused its discretion in refusing to grant the defense a continuance until the Nevada Supreme Court acted on its petition for writ of mandate. He argues that the ruling denied him due process and that the reopened suppression hearing did not cure the violation because the court was without jurisdiction to hold such a hearing. But even if error did occur, no prejudice flowed therefrom. Had the evidence presented in the reopened hearing been included in the initial hearing, it could not have affected the court's ultimate ruling or our review of such ruling. In major part that evidence was consistent with the evidence earlier presented. Where it differed most significantly, it would have led to no different result: Officer Burris testified he considered defendant and Steeg to be under arrest at the time they were handcuffed—whether his partner, Officer De Hoedt, shared his subjective belief we do not know. But in any event that belief is immaterial: even if, without probable cause, Burris "arrested" defendant and Steeg, the conduct that he and De Hoedt engaged in in seizing the pair, the car, and the murder weapon was lawful because it "involved no more than a temporary detention would have allowed." (*People* v. *Waters* (1973) 30 Cal.App.3d 354, 360 [106 Cal.Rptr. 293].)

Finally, defendant urges that by its general conduct of the suppression proceeding the court deprived him of his due process right to a full and fair hearing. We have reviewed the record in its entirety and reject this claim as patently without merit.

First, we doubt that Davis's question may properly be characterized as "interrogation." The inquiry merely sought information that would allow the National City officers to make their travel plans. It certainly does not amount to "express questioning" or to "words . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 301, fn. omitted [64 L.Ed.2d 297, 308, 100 S.Ct. 1682].) And in fact it elicited no such response.

Second, we fail to see how Davis's question rendered defendant's subsequent waiver involuntary. At the extradition hearing the court made sure defendant had read the extradition petition and knew of the California charges. To its question, "And I am told you wish to waive extradition today and go back to California voluntarily; is that correct?" defendant answered, "Yes." The court then informed him that by so doing he would waive his right to obtain an attorney in Las Vegas at his own expense, his right to a formal governor's warrant, and his right to petition for a writ of habeas corpus to test the legality of his confinement in Las Vegas. Defendant stated he understood those rights and then signed a formal waiver of extradition.

Finally, defendant fails to persuade us that whatever impropriety may have occurred here warrants the drastic remedy of dismissal or even the less drastic remedy of suppression of the statements he allegedly made to the jailhouse informants.

C

■ Defendant contends that his conviction should be reversed because (1) one and the same attorney represented him and his codefendants Steeg and Finckel for purposes of arraignment in the municipal court and (2) the magistrate, in violation of Penal Code section 859a, failed to ask him for his plea but entered a plea of not guilty on his behalf. Again he is unpersuasive.

The first point is untenable. Defendant's underlying claim is that his constitutional right to the assistance of counsel was adversely affected because joint representation effectively precluded him from plea bargaining at the time of arraignment. The record, however, does not support defendant's position. The arraignment took place on October 8, 1981—only three days after defendant was extradited from Nevada. Within such a short period of time, counsel could not have fulfilled his " ' "duty to investigate carefully all defenses of fact and of law that may be available to the defendant . . ." ' " (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]), and could not reasonably have begun negotiations on a plea. In any event, separate counsel was appointed at the arraignment, and

he could have begun negotiations and moved to change the not guilty plea had he thought such a course of action to be in defendant's interest.

The second point is also untenable. To begin with, defendant's failure to challenge the magistrate's entry of a plea on his behalf in a Penal Code section 995 motion precludes him from raising the point thereafter. (*People v. Harris* (1967) 67 Cal.2d 866, 870 [64 Cal.Rptr. 313, 434 P.2d 609].) Further, because defendant was properly arraigned in superior court, the defect may have been cured. (*People v. Corbett* (1865) 28 Cal. 328, 330 [dictum].) In any event, the error does not require reversal. ▆ Even when "there is no arraignment or plea but the case is tried as if a 'not guilty' plea has been entered, no miscarriage of justice results from the procedural error [citation]." (*People v. Grigsby* (1969) 275 Cal.App.2d 767, 772-773 [80 Cal.Rptr. 294]; accord, *People v. Sturdy* (1965) 235 Cal.App.2d 306, 312-313 [45 Cal.Rptr. 203].)

## D

▆ Defendant contends the court erred in refusing to compel the prosecution to tender to the court for its approval a negotiated plea that was allegedly offered by the prosecution and accepted by him.

The main facts surrounding the plea negotiations are summarized—to the express satisfaction of the trial prosecutor, Rupert Linley, and to the implied satisfaction of the Attorney General—in the declaration of defense counsel Charles Adair in support of defendant's motion to compel enforcement of the alleged plea bargain. The body of the declaration is set forth in the margin.[4]

---

[4] "Originally, discussions concerning the resolution of the case occurred on approximately April 8, 1982. At that time there was a meeting between the then three defense attorneys, Deputy District Attorney Rupert Linley, and Assistant District Attorney Richard Huffman. The case was discussed and the District Attorney's position was stated to be that they would take a 'package' of a plea to P.C. 187 (1st degree) with the allegation of 12022.5 from Mr. Williams (27 years to life), a plea to P.C. 187 (1st degree) from Mr. Steeg (25 years to life), and a plea to P.C. 187 (2nd degree) from Kevin Finckel. This was to be open prior to motions.

"At that time, no clients were willing to accept the offer. Later, discovery motions, P.C. 1538.5 motions, and P.C. 995 motions were filed. Before the motions were heard, defendant Kevin Finckel pled out to a charge of P.C. 187, 2nd degree, with an agreement of his time to run concurrent to any probation revocation time in the State of Washington.

"The P.C. 1538.5 motion which had been filed was not heard. Discovery motions were heard, as well as P.C. 995 motions, after Kevin Finckel's plea. (None of these issues, I believe, would survive after a plea of guilty).

"After that time, the California Supreme Court granted a stay to decide Writs concerning the case. The Writs were denied, the stay was dissolved, and a new trial and motions date of July 8th, 1982, was set.

Defendant urges us to adopt—on the basis of our rulemaking authority or as a construction of the California Constitution—the rule enunciated by the Fourth Circuit in *Cooper* v. *United States* (4th Cir. 1979) 594 F.2d 12, and followed by the Alabama Supreme Court in *Ex parte Yarber* (Ala. 1983) 437 So.2d 1330.

In *Cooper* the Fourth Circuit held as follows: "When . . . a [plea] proposal—specific, unambiguous and not unreasonable on its face—is offered by the government to a defendant through his counsel, constitutional fairness requires that it be fulfilled if within a reasonable time the defendant unequivocally communicates his assent to it, and unless in the interval extenuating circumstances affecting the propriety of the proposal that were unknown to and not reasonably discoverable by the government when the proposal was made have supervened or become known. This necessarily means that once presented, such a proposal may not be withdrawn in the face of proffered acceptance for no other reason than that a superior disagrees with an apparently authorized subordinate's judgment in making it." (594 F.2d at p. 19.)

---

"On or about Monday, June 21st, 1982, I was called at my office by Deputy District Attorney Rupert Linley and asked whether Michael Williams was going to plead. He stated that he had seen Assistant District Attorney Richard Huffman in the hallway of the courthouse and was told that there were going to be 'no deals' after motions. I stated that this was a change from the previous position of their office, which I understood to be that they would reanalyze the case after motions, with no guarantee of any offers, but with the possibility existing. I stated that I would talk with my client and get back to him.

"I also believed based on this conversation, that the original offer was still open to Michael Williams, especially in view of Kevin Finckel's plea, and the fact that a plea by Michael Williams at this point would not leave any appealable issues, thus the District Attorney's Office was in no worst [*sic*] legal position than they were several months prior. I also knew that the 'package' part of the offer was not insisted on with regards to Kevin Finckel, and thus I believed that it would not be required by Williams.

"Approximately later that day or on the next day, I also received a call from Deputy District Attorney Jeff Dusek, also asking whether Michael Williams was going to plead, and that the[y] had heard that there was going to be no deals after motions. (Mr. Dusek is the Deputy responding to motions on this case.) I again stated that I didn't know, that I would check and inform them.

"After those calls, I had my investigator John MacManus, talk to Michael Williams. He and I arranged a special private visit at the jail between Mr. Williams and his father, so that they could talk about the situation and so could make a decision.

"I talked to Michael Williams on Sunday, June 27th, and he stated that he didn't want to put his family through the stress of trial (nor face a possible death penalty).

"Monday morning, June 28th, I called Mr. Linley and Mr. Dusek and informed them that Michael Williams would plead. Mr. Linley informed me that he had to clear it with Assistant District Attorney Huffman and District Attorney Miller, but that he would be back to me. I also attempted to get the case in court that day for the plea, but the earliest I was able to calendar it was for Wednesday, June 30th, in Department 8. On Wednesday, the case trailed to Thursday. At that point, I was told by Mr. Linley that his superiors refused to approve the arrangement, but had changed the offer to Michael Williams to life without parole."

In *Yarber* the Alabama Supreme Court stated as follows: "Negotiated pleas . . . serve a valuable role in the criminal justice system. If the integrity of that role is to be maintained, certainty must prevail. The state need not enter into a plea agreement. It may choose not to do so, and proceed to trial on any case. The United States Supreme Court states there is no constitutional right to a negotiated plea. [Citation.] However, once the state chooses to make an agreement, it should not be allowed to repudiate that agreement with impunity. [Citation.] A contrary result would not encourage a defendant to come to grips with the moral and strategic considerations necessary to accepting a negotiated plea, and pleading guilty, if he knows the very agreement he must consider is subject to unilateral speculation by the state. If we allow the state to dishonor at will the agreements it enters into, the result could only serve to weaken the plea negotiating system." (437 So.2d at p. 1335, fn. omitted.)

In *Mabry* v. *Johnson* (1984) 467 U.S. 504 [81 L.Ed.2d 437, 104 S.Ct. 2543], however, the United States Supreme Court held the *Cooper* rule was not mandated by the federal Constitution. In impliedly concluding that the due process clause does not preclude the prosecution from withdrawing a plea proposal once it has been accepted by the defendant, the court stated as follows: "A plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest." (*Id.* at p. 507 [81 L.Ed.2d at p. 442].) The court continued: "The Due Process Clause is not a code of ethics for prosecutors; its concern is with the manner in which persons are deprived of their liberty." (*Id.* at p. 511 [81 L.Ed.2d at p. 445].)

Although the rationale the Fourth Circuit articulates is not unpersuasive, we decline at this time to adopt the *Cooper* rule. But even if we were to adopt it, defendant would not be entitled to the relief he seeks. As he himself recognizes, the defendant must show at the threshold that an agreement in fact existed. This he is unable to do: the offer that he attempted to accept was no longer outstanding.

As defense counsel Adair admitted at the hearing on the motion to compel: "There were initial discussions and their proposal was made and out on the table, you might say. Then a lengthy period of time went by. *Quite frankly, I am not sure if it is in my declaration, but due to that period of time at that point I assumed that probably it still wasn't open.* We had been through some discovery motions. There have been no substantive motions that would be like a 1538.5 that would survive a plea, *but it would be my understanding that at that point the people reasonably couldn't have been held to the offer.*" Defendant admits as much on appeal. The question

both Deputy District Attorney Linley and Assistant District Attorney Huffman posed to Adair—is defendant going to plead?—may reasonably be understood as an attempt to reopen negotiations. We shall take Adair at his word—he honestly believed the question renewed the stale offer. But we do not believe that a reasonable person, who knew as Adair did that Finckel had agreed to testify against defendant and Steeg, would interpret the question as a renewal of the offer made before Finckel had entered into the agreement.

Defendant also argues that the prosecution's withdrawal of its original proposal "is presumptively based on Penal Code section 1192.7"—which restricts plea bargaining—and hence that he "should be permitted to tender his acceptance to the original prosecution offer because [that provision] does not apply to his case." To the extent we understand the point, we reject it. We believe, at least on the facts of this case, that the prosecution could have withdrawn its offer for any ethically proper reason it chose. In any event, the record establishes, clearly to our eyes, the reason the prosecution "upped the ante": it had persuaded Finckel to agree to testify on behalf of the People.

## E

Defendant contends that the exclusion of prospective jurors Kathleen Best and Patricia Haywood-Reid—who stated that they could not vote for the death penalty but could be impartial on the issue of guilt—denied him his right to a jury drawn from a cross-section of the community and his right to an impartial jury. This contention has been rejected by us (*People* v. *Melton* (1988) 44 Cal.3d 713, 732 [244 Cal.Rptr. 867, 750 P.2d 741]), and by the United States Supreme Court (*Lockhart* v. *McCree* (1986) 476 U.S. 162, 173-183 [90 L.Ed.2d 137, 147-154, 106 S.Ct. 1758]).

## F

Defendant contends the court should have obtained his personal, on-the-record waiver before it ordered closed *Hovey* voir dire. (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].) Defense counsel successfully moved, over the prosecution's objection, that the court conduct *Hovey* voir dire in private. Defendant now argues the right to public voir dire requires his personal, express waiver. Neither this court nor the United States Supreme Court has so held, and defendant fails to present either reason or authority that persuades us we should do so now.

## G

Defendant contends the court erred in ruling that he would be subject to wide cross-examination even if defense counsel limited direct examination

to the issue whether he actually made the admissions related by the two jailhouse informants. Under long-settled law, to be sure, such a ruling would be error. (E.g., *People* v. *O'Brien* (1885) 66 Cal. 602, 602-603 [6 P. 695].) We do not believe, however, that such a ruling was made in this case. The court's words seem more reasonably construed to be a cautionary statement on the danger of exposing defendant to extensive cross-examination than the ruling defendant understands them to be.

But even if the court did make the ruling defendant complains of, the error was not prejudicial. In view of Finckel's testimony and the physical evidence introduced at trial, including notably the murder weapon, it is not reasonably probable that defendant's denial that he had made the admissions in question would have resulted in a more favorable outcome.

### H

 Defendant contends that the court improperly admitted evidence that he, Steeg, and Finckel had been stopped by a police officer on September 28, 1981; that he and Finckel had been booked into and released from the San Diego County jail on September 29; and that he, Steeg, and Finckel burglarized Beardsley's apartment on September 30. Under the analysis of the admissibility of other-crimes evidence in *People* v. *Thompson* (1980) 27 Cal.3d 303, 314-318 [165 Cal.Rptr. 289, 611 P.2d 883], the point is not without merit. Whatever error may have occurred, however, was nonprejudicial. We have taken into account the fact that on voir dire three members of the jury stated they had been victims of burglary and several members expressed the belief that recidivists were treated too leniently. We nevertheless conclude that in light of Finckel's testimony and the introduction of the murder weapon, an outcome more favorable to defendant would not have resulted in the absence of the claimed error.

### I

 Defendant contends the court erred in giving a version of CALJIC No. 8.11—the definition of malice aforethought—that reflected statutory changes made subsequent to the murder in the case at bar. The Attorney General impliedly concedes the error, but urges the error was harmless. We agree. The 1982 revision of the instruction affected only the definition of implied malice—specifically, it omitted the phrase that explained the words "wanton disregard for human life" as "awareness of a duty imposed by law not to commit . . . acts [involving a high risk of death] followed by the commission of the forbidden act despite that awareness." Implied malice, however, was not involved in this case. Here the prosecution sought to prove, and the court instructed on, premeditated and deliberate murder,

which requires express malice, and felony murder, which does not require malice at all. The definition of implied malice, therefore, was surplusage and could not have adversely affected the verdict.

Defendant also claims, in substance, that the instruction erroneously suggested implied malice is an element of felony murder. Even if it did, no prejudice appears: the error would do nothing more than require the jury to find an additional "element" before it could convict on this theory.

### J

■ Defendant contends the court erred by refusing his requests for instructions on the defenses of voluntary intoxication and diminished capacity by voluntary intoxication. The point must be rejected.

The applicable rules of law are settled. ■ When there is no evidence from which a jury could conclude that the defendant suffered from diminished capacity sufficient to negate the requisite criminal intent—in other words, when the evidence in support is at most minimal—instructions on the defense of diminished capacity may properly be refused. (*People* v. *Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513].) ■ Similarly, when there is no evidence from which a jury could conclude that as a result of voluntary intoxication the defendant failed to form the requisite criminal intent or attain the requisite mental state, instructions on the defense of voluntary intoxication may properly be refused. (*People* v. *Miller* (1962) 57 Cal.2d 821, 830-831 [22 Cal.Rptr. 465, 372 P.2d 297]; *People* v. *Turville* (1959) 51 Cal.2d 620, 633 [335 P.2d 678]; *People* v. *Price* (1929) 207 Cal. 131, 133 [277 P. 316]; cf. *People* v. *Carr, supra,* at p. 294 [diminished capacity].)

■ The sole evidence relevant to the defenses of voluntary intoxication and diminished capacity by voluntary intoxication is contained in Finckel's testimony on behalf of the defense. That testimony is reducible to statements to the effect that defendant was "acting like he was on LSD" and was "acting crazy," i.e., "making facial expressions, being kind of jumpy[,] . . . [changing] the tone of his voice."

Under the rule stated above, the court did not err in refusing defendant's request for instructions on the defense of diminished capacity by voluntary intoxication. The evidence that can be taken to support the defense—comprising, as it does, Finckel's testimony alone—is at most minimal and hence did not obligate the court to grant the request.

As we stated in a similar context, "In the present case, defendant presented no evidence whatever, expert or otherwise, regarding the intoxicating

effect, if any, which his use of [an] undetermined amount[ ] of [LSD] may have had upon his ability to form the necessary intent to rob or kill. Nor was the matter shown to be one of common knowledge to an ordinary juror. In this regard, the case is comparable to that presented to us in *People* v. *Carr, supra,* [8 Cal.3d 287,] wherein defendant claimed that he was improperly denied jury instructions on the subject of diminished capacity by reason of marijuana use. In *Carr,* we noted that 'It has been held that merely showing that the defendant consumed some alcohol prior to commission of the crime without showing the effect of the alcohol on him is not sufficient to warrant an instruction on diminished capacity. [Citations.] Similar rules should apply to the consumption of marijuana. [¶] In the instant case, there is no evidence as to the amount of marijuana smoked. The only evidence as to the effect on defendant of the marijuana is that it gave him courage to carry out his criminal design. *Such evidence in no way negates his intent to commit his acts or his awareness of their wrongful nature.* [Citation.] . . . [W]e are satisfied that, in the absence of evidence indicating the quantity of marijuana consumed or additional evidence reflecting the state of defendant's mind, a jury could not reasonably have concluded, in the light of the evidence in this case, that defendant by reason of intoxication [could not form the requisite criminal intent].' (Pp. 294-295, italics added.)" (*People* v. *Frierson* (1979) 25 Cal.3d 142, 156 [158 Cal.Rptr. 281, 599 P.2d 587] (plur. opn.).)

Similarly, the court did not err in refusing defendant's request for instructions on the defense of voluntary intoxication. Here too the evidence that can be taken to support the defense—being nothing more than Finckel's testimony to the general effect that defendant may have consumed LSD on the night of the killing and was acting as though he had—is at most minimal and did not obligate the court to grant the request. There is no evidence whatever going to the issue whether as a result of his alleged consumption of an undetermined amount of LSD defendant failed to form the requisite criminal intent, nor is the matter of common knowledge to the ordinary juror. Thus, the request was properly refused. (See *People* v. *Miller, supra,* 57 Cal.2d at pp. 830-831; cf. *People* v. *Frierson, supra,* 25 Cal.3d at p. 156 [diminished capacity].)

## K

 Defendant contends the court gave the jury prejudicially erroneous instructions on accomplice testimony. Specifically, he argues that although it properly instructed that Finckel was an accomplice as a matter of law and that his testimony had to be viewed with distrust and required corroboration (1979 rev. of CALJIC Nos. 3.10, 3.11, 3.12, 3.16, and 3.18), it undermined the effectiveness of that charge by delivering CALJIC Nos.

2.11.5 and 2.27 (1977 rev.). The latter states: "Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact required to be established by the prosecution to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends." The former states: "There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which the defendant is on trial. [¶] You must not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted."

We agree with defendant that the court should not have instructed the jury in accordance with CALJIC Nos. 2.11.5 and 2.27 in this case: those instructions might be understood to conflict with the charge on accomplice testimony. Thus, the use note to CALJIC No. 2.11.5 expressly tells trial courts not to give this instruction if a person involved in the crime (other than the defendant) is a witness for either the prosecution or the defense. And the use note to CALJIC No. 2.27 expressly tells them not to give this instruction when corroboration is required.

We cannot agree, however, that the giving of CALJIC Nos. 2.11.5 and 2.27 amounted to error in this case. It is settled that "we must look to the entire charge, rather than merely one part, to determine whether error occurred." (*People* v. *Chavez* (1985) 39 Cal.3d 823, 830 [218 Cal.Rptr. 49, 705 P.2d 372].) After review, we do not believe that CALJIC No. 2.27 was likely to mislead the jurors on how they should evaluate Finckel's testimony: a reasonable juror would treat that instruction as stating the general rule and the charge on accomplice testimony as stating the exception applicable to Finckel; we have no reason to believe that the jurors here may have acted otherwise. (See *id*. at pp. 830-832.) Nor do we believe that CALJIC No. 2.11.5 was likely to mislead: a reasonable juror would continue to act in accordance with the court's charge on accomplice testimony, but would simply refrain from discussing or giving any consideration to the separate issue why Finckel was not being prosecuted in the present action or whether he had been or would be prosecuted; again, we have no reason to believe that the jurors here may have acted otherwise.

## L

 Defendant contends the court erred by failing to modify sua sponte CALJIC No. 3.18, the standard instruction to distrust the testimony of an accomplice. The point is well taken.

Finckel was the prosecution's crucial witness in its case against defendant. Called as a witness on behalf of defendant, however, Finckel also gave

testimony that can be construed as favorable to defendant—to the effect that on the night of the killing defendant was acting as though he was under the influence of LSD and may in fact have taken the drug.

The law on this question is clear. When an accomplice is called as a witness by the prosecution, the court must instruct the jurors sua sponte to distrust his testimony. (*People* v. *Cortez* (1981) 115 Cal.App.3d 395, 406 [171 Cal.Rptr. 418]; see *People* v. *Terry* (1970) 2 Cal.3d 362, 399 [85 Cal.Rptr. 409, 466 P.2d 961].) When, by contrast, he is called by the defendant, the instruction should be given only at the defendant's request. (*People* v. *Cortez, supra,* at p. 406; *People* v. *Miller* (1960) 185 Cal.App.2d 59, 82 [8 Cal.Rptr. 91].) Finally, when he is called by both parties, the instruction should be tailored to relate only to his testimony on behalf of the prosecution. (See *People* v. *Cortez, supra,* at p. 406; *People* v. *Watson* (1952) 113 Cal.App.2d 799, 803 [249 P.2d 38].) Under these principles, the court erred: it was obligated, but failed, to instruct the jurors that they should regard with distrust only Finckel's testimony on behalf of the prosecution.

We conclude, however, that the error was not prejudicial. Finckel's testimony on defendant's behavior did not go to the defense of alibi and, in any event, is manifestly of little weight in the circumstances. It is not reasonably probable that an outcome more favorable to defendant would have resulted had the court tailored the instruction.

## M

 Defendant contends the court erred by failing to define the word "conspiracy" sua sponte. Pursuant to CALJIC No. 2.50 with adaptations not relevant here, the court instructed the jury as follows. "Evidence has been introduced for the purpose of showing that the defendant committed a crime other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: A motive for the commission of the crime charged; the existence of a conspiracy. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

When a term is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, an instruction as to its meaning is not required in the absence of a request. (*People* v.

*Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].) In this case, the word "conspiracy" was used in its common and nontechnical meaning of an agreement to do harm. Indeed, it is undisputed that the existence *vel non* of a "conspiracy" in the technical sense of that term was not a material issue in the guilt phase. Further, no request for a definition was made. Accordingly, the court did not err in failing to define the word.

## N

■ Defendant persuasively contends the court erred in failing to instruct the jurors sua sponte on the manner in which they should consider his alleged preoffense oral admissions.

The prosecution presented the following "motive theory": defendant, Steeg, and Finckel robbed and killed Lock in order to get transportation to Riverside and, once there, to burglarize Beardsley's apartment. The theory was based on the testimony of Finckel, who described the trio's planning of the burglary, including admissions by defendant.

In *People* v. *Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1], we held the court must instruct sua sponte that "evidence of an oral admission should be viewed with caution . . . ." Under *Beagle,* therefore, the court's failure to so instruct was error. The error, however, was not prejudicial. As we explained in *Beagle,* "The omission . . . does not constitute reversible error if upon a reweighing of the evidence it does not appear reasonably probable that a result more favorable to defendant would have been reached in the absence of the error." (6 Cal.3d at p. 455.) Especially in view of the fact that, in substance, the jurors were properly instructed as to how they should treat the testimony of an accomplice, a more favorable result was not reasonably probable here absent the error.

## O

Defendant contends that by instructing on liability as an aider and abetter pursuant to former CALJIC No. 3.01, the court erred under *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318]. The Attorney General impliedly concedes the error, but urges it was harmless. We agree. The record demonstrates this is a case in which the *Beeman* error could not possibly have affected the verdict. All the evidence established that defendant was either the principal perpetrator of the offenses or not involved at all; there was absolutely *no* evidence that he was an aider and abetter. Thus, under the evidence the aiding and abetting instruction was simply not applicable and therefore could not have subjected defendant to prejudice.

P

■ Defendant finally contends the court erred by refusing to instruct on second degree murder. The point must be rejected. Because the evidence conclusively disclosed that the homicide was committed in the course of a robbery, it was first degree murder under the felony-murder rule, the issue of premeditation and deliberation was immaterial, and "There was no occasion . . . for the giving of an instruction on murder of the second degree . . . ." (*People* v. *King* (1939) 13 Cal.2d 521, 525 [90 P.2d 291].) That the court told the jurors in its preinstructions that it would instruct them on second degree murder fails to transform its later and proper refusal to give the requested instruction into error.

## II. *Special Circumstance Issues*

Defendant raises three contentions pertaining to the special circumstance finding. None demonstrates reversible error.

### A

Defendant contends the special circumstance finding is invalid because the court failed to instruct the jury that intent to kill was an element of the felony-murder special circumstance. We do not agree.

■ As we held in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], "The court must instruct on intent to kill as an element of the felony-murder special circumstance when there is evidence from which the jury could find [citation] that the defendant was an aider and abetter rather than the actual killer." Here, all the evidence showed that defendant either actually killed Lock or was not involved in the crime at all; there was no evidence that he was an aider and abetter. Accordingly, the court did not err in failing to instruct the jury on intent.

### B

Defendant contends the instruction on the special circumstance is defective under *People* v. *Green* (1980) 27 Cal.3d 1, 59-62 [164 Cal.Rptr. 1, 609 P.2d 468]. The point is without merit: the challenged instruction tracks the very language of *Green*.

### C

■ Defendant finally contends the court improperly refused to instruct the jury that the corpus delicti of the special circumstance had to be proved

independently of his extrajudicial statements. The Attorney General concedes the error, but persuasively urges it was nonprejudicial. When "the corpus delicti is convincingly established independently of admissions[,] . . . the error of the omission of that instruction cannot be deemed as reversible." (*People* v. *Beagle, supra,* 6 Cal.3d at p. 456.) Here, Finckel's testimony convincingly established the corpus delicti of robbery. Defendant asserts the testimony of an accomplice cannot be so used. He is wrong: the uncorroborated testimony of an accomplice can establish the corpus delicti. (E.g., *People* v. *Bowley* (1964) 230 Cal.App.2d 269, 271 [40 Cal.Rptr. 859]; *People* v. *McLaughlin* (1957) 156 Cal.App.2d 291, 297 [319 P.2d 365].)

### III. *Penalty Issues*

Of the many contentions defendant makes going to the issue of penalty, none, as will appear, requires the reversal of the judgment of death.

### A

Defendant contends prospective Jurors Best and Haywood-Reid were improperly excused for cause because of their views on the death penalty. The record is otherwise.

In *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88, S.Ct. 1770], the United States Supreme Court implied that a prospective juror could not be excused for cause unless, as relevant here, he made it "unmistakably clear" that he would "*automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case . . . ." (*Id*. at p. 522, fn. 21 [20 L.Ed.2d at p. 785], italics in original.) In *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], however, the high court "clarified" *Witherspoon* and declared that the proper standard was "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id*. at p. 424 [83 L.Ed.2d at pp. 851-852].) In *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250], we adopted the *Witt* standard.

But under even the *Witherspoon* standard, excusal here was proper. Defendant, to be sure, *claims* that it is unclear whether the two prospective jurors opposed the death penalty itself or rather the California death penalty scheme which, he alleges, was erroneously described to them. But it is plain from the face of the record that each of the two prospective jurors made it unmistakably clear she could not vote to impose the death penalty because of her opposition to the penalty itself.

## B

Defendant contends that the prosecution introduced evidence in aggravation in violation of the prior-to-trial notice requirement of Penal Code section 190.3.

Several months before trial, the prosecution gave what defendant concedes was proper notice of evidence to be introduced on the following two matters among others: (1) "On September 29, 1981, Williams threatened Mr. and Mrs. William Carl with the use of force and violence"; and (2) "In the presence of Shane McGee [*sic*], Williams, Steeg, and Finckel, on or about October 1, 1981 and October 2, 1981, conspired and planned to murder and rob people in Long Beach and Las Vegas." At the penalty phase, without defense objection, Carl testified defendant said he "belonged to the Mafia, and he had a gun on his hip, and if I talked to the police I would be dealt with." Similarly without objection, Finckel testified that defendant devised the following plan to get money: "He said that he—to wait until the car stopped at a red light, and hop into a car and pull the gun out, and take the guy's money."

As even a cursory comparison of the notice and the evidence introduced reveals, the notice was sufficient. Thus, no error appears.

## C

Defendant contends the court erred in denying his motion for a new trial based on the following alleged misconduct of a juror: (1) during trial the juror took tranquilizers; and (2) between the guilt and penalty phases she had a conversation with her mother in which they discussed "the religious aspects of the penalty phase" and "agreed that they both believe in 'an eye for an eye.'"

"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92]; accord, *People* v. *Villagren* (1980) 106 Cal.App.3d 720, 729 [165 Cal.Rptr. 470].)

No such abuse appears here. The sole evidence of the alleged misconduct was the declaration of a defense investigator that purports to relate a conversation with the juror. It is settled, however, that "a jury verdict may not be impeached by hearsay affidavits." (*People* v. *Villagren, supra,* 106

Cal.App.3d at p. 729; accord, *People* v. *Spelio* (1970) 6 Cal.App.3d 685, 690 [86 Cal.Rptr. 113].)[5]

## D

Defendant contends the court erred under *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446] when, over defense objection, it permitted an expert to testify about defendant's future dangerousness and to give an opinion that he could kill again.

On cross-examination, defense witness Dr. Thomas Gitchoff was asked: "Is it your opinion that the defendant, because of his personality and the ways prisons are, might be in a position where he might kill in prison?" Over defense objection, Dr. Gitchoff was permitted to answer. He asked for the question to be repeated, and in response the court rephrased it as follows: "could he kill in prison?" He answered, "Yes, anyone can."

Dr. Gitchoff's testimony plainly falls within the general rule we articulated in *Murtishaw*: expert testimony on the possibility of future violent acts should not be admitted. The rule, of course, is not absolute: "We acknowledge that despite the recognized general unreliability of psychiatric predictions concerning future violence, it may be possible for a party in a particular case to show that a reliable prediction is possible. A more reliable forecast, for example, might be possible if the psychiatrist had established a close, long-term relationship with defendant that gives him a greater understanding of defendant's behavior than can usually be attained in brief, often adversary, pretrial interviews. A reliable prediction might also be conceivable if the defendant had exhibited a long-continued pattern of criminal violence such that any knowledgeable psychiatrist would anticipate future violence." (*People* v. *Murtishaw, supra,* 29 Cal.3d at p. 774.)

Neither exception, however, is supported by this record. Gitchoff was a criminologist, not a psychiatrist, and had no relationship with defendant. Further, defendant had not exhibited the requisite "long-continued pattern of criminal violence."

The error, nevertheless, was nonprejudicial. Before Dr. Gitchoff gave the testimony under challenge on cross-examination, he made what is effectively a similar prediction of future dangerousness on direct examination by defense counsel. Any harm that may have arisen from such a

---

[5] Defendant argues that if the hearsay declaration he presented was insufficient to support his motion, the court erred in failing to grant a motion he made for an evidentiary hearing on the matter. Because he did not even attempt to explain why he did not obtain and present the declaration of the juror herself, no error appears.

prediction arose from Dr. Gitchoff's testimony on direct, and defendant, of course, may not complain of it. (Cf. *People* v. *Harris* (1981) 28 Cal.3d 935, 951-953 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn.) [implying that the defendant may not complain of "prejudice" caused by testimony volunteered by him on the stand].)[6]

E

Defendant contends the court committed several instructional errors. Before turning to his claims, we shall briefly describe how the court instructed the jury. At the beginning of the penalty phase, the court preinstructed the jurors as to the statutory sentencing factors pursuant to CALJIC No. 8.84.1. At the end, it charged them pursuant to the following five standard instructions as they then stood: (1) CALJIC No. 2.60 (no inference of guilt may be drawn from the defendant's failure to testify); (2) CALJIC No. 2.90 (the defendant is presumed innocent and the prosecution must prove guilt beyond a reasonable doubt); (3) CALJIC No. 8.84 (introductory penalty phase instruction); (4) CALJIC No. 8.84.1 (statutory sentencing factors); and (5) CALJIC No. 8.84.2 (concluding penalty phase instruction). The court did not incorporate by reference any guilt phase instructions into this proceeding.

The first error defendant alleges is the court's failure to instruct sua sponte on how expert testimony is to be evaluated. Assuming that such a failure to instruct is error under Penal Code section 1127b even when, as here, the only experts who testified did so on behalf of the defense, we believe the error does not require reversal. The court gave a proper instruction on this matter at the guilt phase (CALJIC No. 2.80). We may presume that such an instruction, which is not limited to the issue of guilt or innocence, was understood by the jurors to apply to the penalty deliberations as well. (See *People* v. *Gates* (1987) 43 Cal.3d 1168, 1209 [240 Cal.Rptr. 666, 743 P.2d 301].) Further, " 'It is . . . the rule . . . that the erroneous failure to instruct the jury regarding the weight of expert testimony is not prejudicial unless the reviewing court, upon an examination of the entire cause, determines that the jury might have rendered a different verdict had the omitted instruction been given. [Citations.]' " (*People* v. *Lynch* (1971) 14 Cal.App.3d 602, 610 [92 Cal.Rptr. 411], and cases cited; accord, *People* v. *Haynes* (1984) 160 Cal.App.3d 1122, 1137 [207 Cal.Rptr. 139].)

---

[6]Defendant challenges the competence of Dr. Gitchoff to testify on future dangerousness. Even if a party may challenge the competence of his own witness (contra, *Wheelock* v. *Godfrey* (1893) 100 Cal. 578, 587-588 [35 P. 317]), such a challenge may not be made for the first time on appeal (*People* v. *Dessauer* (1952) 38 Cal.2d 547, 552 [241 P.2d 238]; *People* v. *Smith* (1977) 70 Cal.App.3d 306, 317 [138 Cal.Rptr. 783]).

�In Review of the entire record persuades us that under any standard the claimed prior was harmless.

The second error alleged is the court's refusal to instruct on the law governing admissions, confessions, and corpus delicti, and its failure to instruct sua sponte on how preoffense statements are to be treated. The error, if such it be, does not require reversal. As to admissions and confessions, the court gave a proper instruction at the guilt phase. Accordingly, we may presume that this instruction, which was not limited to the question of guilt or innocence, was understood by the jurors to apply to the penalty deliberations as well. (See *People* v. *Gates, supra,* 43 Cal.3d at p. 1209.) As to corpus delicti and preoffense statements, however, the court gave no instructions at the guilt phase. But under any standard the claimed error was harmless.

�In The third error alleged is the court's refusal to instruct on conspiracy and accomplice testimony with regard to the claimed plan of defendant and his confederates to commit murder and robbery in Long Beach and Las Vegas—specifically, its refusal to define the term "conspiracy" or to charge the jurors that the testimony of an accomplice ought to be viewed with distrust and must be corroborated.

We agree that the court erred. Conspiracy was at issue in the penalty phase and hence should have been defined on defendant's request. (See *People* v. *Earnest* (1975) 53 Cal.App.3d 734, 744-745 [126 Cal.Rptr. 107] [holding that the court must define the term sua sponte].) Further, the jurors should have been cautioned on the use of accomplice testimony. (*People* v. *McClellan* (1969) 71 Cal.2d 793, 804-806 [80 Cal.Rptr. 31, 457 P.2d 871]; see *People* v. *Varnum* (1967) 66 Cal.2d 808, 815 [59 Cal.Rptr. 108, 427 P.2d 772] [holding that "Penal Code section 1111, prohibiting proof of an earlier crime by the uncorroborated testimony of an accomplice, also applies at the trial on the issue of penalty"].)

We cannot agree, however, that the error was prejudicial. As stated above, the court gave proper instructions on accomplice testimony at the guilt phase. (See part I K, *ante.*) Accordingly, we may presume that these instructions, which were not limited to the question of guilt or innocence, were understood by the jurors to apply to the penalty deliberations as well. (See *People* v. *Gates, supra,* 43 Cal.3d at p. 1209.) Further, although the court did not instruct on conspiracy at the guilt phase, we believe that even if the jury had been properly instructed and had chosen to disregard the evidence of the alleged conspiracy, it would still have returned a verdict of death: to our mind, the evidence had no marginal effect on the balance of aggravating and mitigating factors.

The fourth error alleged is the court's refusal to instruct on the elements of certain uncharged crimes. The point is well taken. (*People* v. *Phillips* (1985) 41 Cal.3d 29, 73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].) The error, however, was nonprejudicial. Because the only uncharged "crime" the prosecutor presented to the jurors in aggravation was defendant's alleged attempt to intimidate Carl, we conclude that under any standard the error was harmless.

The fifth error alleged is the court's refusal to instruct the jurors that before they could consider any fact in aggravation they had to find it true beyond a reasonable doubt. We rejected this point in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].

The sixth error alleged is the court's refusal to instruct that a single mitigating circumstance, standing alone, may be sufficient to support a determination that death is not the appropriate penalty. The claim does not establish reversible error. We believe that on this record the court's instruction in accordance with CALJIC No. 8.84.2, together with the penalty phase arguments, suggested the "qualitative" character of the process of weighing aggravating and mitigating factors and thereby adequately informed the jurors of their sentencing discretion and responsibility in this regard. For example, the prosecutor told the jurors that they were not merely "to add these [factors] up and go home. Rather you have to determine the weight to give to each of these. Some might be the entire point of the whole exercise." He also made it plain that it was the jurors' function to determine which penalty was appropriate on the facts of the case. Defense counsel argued to similar effect. We recognize that the standard instruction given here contained the language we held potentially misleading in *People* v. *Brown* (1985) 40 Cal.3d 512, 538-545 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nomine California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]. But having reviewed the penalty phase in its entirety, we cannot conclude that the instruction was misleading in the context of this case.

The seventh error alleged is the court's refusal to give the following "sympathy" instruction: "You may consider pity, sympathy, and mercy in deciding the appropriate penalty; however, your opinion may not be governed by guessing, prejudice, or public opinion. Moreover, you may not impose the death penalty out of mercy or pity for the defendant."

The first sentence of the proposed instruction could reasonably have been understood by the jurors as permitting them to indulge in sympathy unrelated to any of the evidence adduced at trial. Such an instruction, however, may properly be refused. (See *California* v. *Brown, supra,* 479 U.S. at p. 542

[93 L.Ed.2d at p. 940, 107 S.Ct. at p. 839].) The second sentence rests on the assumption that since defendant was then about 21 years old, the jurors may have believed that imposing a sentence of life imprisonment without possibility of parole was harsher than imposing the death penalty. That assumption, however, is unsupported. Rather, we believe the jurors followed the instructions and the arguments of the prosecutor and defense counsel, which clearly implied that the sentence of death was the harsher.

The eighth error alleged is the court's failure to instruct the jury, sua sponte, in accordance with the charge we subsequently required in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813]. On this point, however, we cannot predicate reversal. After reviewing the record of the penalty phase as a whole, including the fact that defendant introduced substantial character and background evidence in mitigation and the fact that defense counsel emphasized and the prosecutor conceded that such evidence was relevant, we cannot conclude that the jury may have been led to entertain the erroneous belief that it could not consider defendant's mitigating evidence.

The ninth error alleged is the court's refusal to expressly instruct that death was a greater punishment than life without parole. Defendant argues that such an instruction was needed because some jurors may have voted for death on the belief that for a person as young as he that penalty was actually less harsh than life without parole. Because, as we have stated, we cannot accept the argument's predicate, we must reject its conclusion.

The tenth error alleged is the court's *failure* to give the Briggs Instruction. Because we have held that it is error to give the instruction (*People* v. *Ramos* (1984) 37 Cal.3d 136, 150-159 [207 Cal.Rptr. 800, 689 P.2d 430]), it cannot be error to fail to do so. Defendant argues the instruction should have been given here to make clear to the jurors that death was the harsher penalty. As we have stated, no such clarification was needed in this case— and certainly not in the form of the Briggs Instruction.

The eleventh error alleged is the court's refusal to instruct that defendant's age at the time of the killing—19—was a mitigating circumstance as a matter of law. Defendant's argument in support establishes only that his age *may* be considered in mitigation, not that it *must* be so considered. Accordingly, we reject the point.

The twelfth error alleged is the court's refusal to give a "pinpoint" instruction under CALJIC No. 8.84.1(h), to the effect that the abuse and neglect defendant suffered at the hands of his parents and other adverse environmental influences were to be considered in mitigation. It is

long settled, however, that a court may properly refuse an instruction that is argumentative in nature. The instruction requested by defendant was such. Hence, we conclude that the court did not err in acting as it did. (See *People* v. *Howard* (1988) 44 Cal.3d 375, 441-442 [243 Cal.Rptr. 842, 749 P.2d 279] [rejecting a similar argument].)

The thirteenth error alleged is the court's failure to omit from CALJIC No. 8.84.1 any aggravating factor not supported by at least some evidence. In *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127], we rejected an argument that the court erred by failing to omit unsupported *mitigating* factors. For the same reasons we reject defendant's argument here.

The fourteenth error alleged is the court's refusal to instruct the jurors, pursuant to CALJIC No. 17.40, that each of them had to consider the evidence, discuss the evidence and the other instructions with his fellows, and then decide the case for himself. Even if the court's refusal was error, in light of argument by both the prosecutor and defense counsel incorporating the substance of CALJIC No. 17.40 we fail to see how such a refusal could have subjected him to prejudice.

The fifteenth error alleged is the court's failure to instruct the jury sua sponte not to consider the evidence of the guilt phase that defendant was stopped by the police on September 28, 1981, was booked into the San Diego County jail on September 29, and burglarized Beardsley's apartment on September 30. He fails to persuade us, however, that the court was subject to such a duty. In any event, in light of the other evidence before the jury at the penalty phase—most notably the circumstances of the murder itself—whatever error may have occurred was harmless under any standard of prejudice.

The sixteenth error alleged is the court's refusal to instruct that only the factors specified in the statute could be considered in aggravation. The point has merit. (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 772-779 [215 Cal.Rptr. 1, 700 P.2d 782].) Whatever error occurred, however, was nonprejudicial under any standard: the record does not suggest that any extraneous "factors" were in fact presented to or considered by the jury.

Finally, defendant may be understood to allege that the court erred by failing to instruct the jury, sua sponte, in accordance with the charge we subsequently required in *People* v. *Brown, supra,* 40 Cal.3d 512, 544, footnote 17. On this point, however, we cannot reverse the judgment. After reviewing the penalty phase as a whole, we find nothing on which to predicate a determination that the jury may have been misled to defendant's

prejudice about the scope of its sentencing discretion and responsibility by the pre-*Brown* instruction.

## F

Defendant contends that certain actions of the court during the guilt phase prejudiced him at the penalty phase. He first cites the erroneous instruction on implied malice. His argument is tortuous and fails to show how surplusage at the guilt phase could harm him at the penalty phase. He also points to the court's error in failing to define "conspiracy" sua sponte. The point must be rejected as patently without merit: as we have explained, the existence of a conspiracy was simply not a material issue. He finally cites the court's refusal to instruct on second degree murder. But because, as we have concluded, no error occurred, no prejudice could have arisen.

## G

Defendant contends that five times in closing argument the prosecutor engaged in misconduct.

 First, he urges that in the following portion of his argument the prosecutor appealed to the jurors' religious passions and prejudices. "The fact is that capital punishment has been a principle of justice for literally thousands of years. If you read the Book of Exodus, you will find that Moses laid down capital punishment as the punishment for premeditated murder. He who slays while laying in wait. [¶] In that same book and later, Moses tells us: Upon penalty of death, slay not the innocent or the righteous. He doesn't say there will be no capital punishment. To the contrary, there was and there has been ever since then because that is part of justice, is what is just when a person commits the ultimate evil."

We do not find defendant's argument convincing. In context the prosecutor's words were part of a short and fairly neutral "history" of capital punishment, and do not appear calculated to appeal to the jurors' religious passions or prejudices.

Second, defendant complains of the following comments. "You have to take a position. It was about two months ago when we first talked about the ability of a person to take a position as a juror and decide whether or not the death penalty is appropriate. And there were people who could not do that, and who are not now in the courtroom for that reason. They are people who do not take a position in life between good and evil, they are bystanders in every type of war we have. . . . [¶] There are those who cannot impose the death penalty just as there are those who cannot fight in

a war, regardless of whether the war is right or wrong, good or evil. There are those, I suppose, who would stand by and watch an innocent person struck down because they don't want to impose themselves in the battle between good and evil."

Although the prosecutor's comments amount to an unfair and unkind criticism of those prospective jurors who expressed an unalterable moral opposition to the death penalty and were accordingly excused, defendant fails to show that they constitute serious misconduct. In any event, we are precluded from reaching the issue: no objection of any kind was made at trial and a timely admonition could have cured any harm. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.)

Third, defendant claims in effect that the prosecutor's reference to Dr. Gitchoff's testimony on future dangerousness exacerbated the alleged *Murtishaw* error (*People* v. *Murtishaw, supra,* 29 Cal.3d 733) and hence constituted misconduct. We are not persuaded. Indeed, we believe that in context the remarks operated to *mitigate* the prejudicial effect of Dr. Gitchoff's testimony. "And didn't Dr. Gitchoff tell you that there are circumstances in prison where a man like Michael Williams might kill again? That may be the case. *That is not what we are here to talk about. If that is true, that is a flaw in the prison system and it does not become the determining factor in whether or not the death penalty is appropriate.* [¶] *If this defendant deserves to die, it is for that reason* [*i.e., because he killed Lock*]*, not because he might be dangerous again. . . .* [¶] It is true that he has killed and he is prepared to kill again. It is true that the evidence indicates that if we were among his society, none of us would be safe. *But that is unimportant.* Because to suggest that is what we are here about would be to deny that he must be punished for killing Gregory Lock." (Italics added.)

Fourth, defendant claims the prosecutor attempted to mislead the jurors into believing that Lock was his parents' sole or only remaining child. But the challenged comment—"When he died, their future died"—is not fairly susceptible of that inference.

Fifth, defendant complains of a brief and isolated comment on the part of the prosecutor, to the effect that the future of Lock's parents had died because "parents will live their lives through their children" and Lock "had a good future ahead of him." Specifically, he claims that the prosecutor improperly presented through argument what, under *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], he could not present through evidence, i.e., the effect that Lock's murder had on his parents. Even if the remark was questionable, no prejudice appears. In view of the fact that the evidence in aggravation was strong and the comment was brief

and isolated, we are of the opinion that the impropriety—if such it be—was harmless under any standard.

██ Finally, defendant complains of the following comments. "Also, what we found from his background is that this was not an isolated act, that this was building over years and years from a much earlier age. We found that there was violence in the defendant, there was a hate in the defendant, a desire to be number one, to be a big man, even though he is little of stature. That desire, the inability to accept being teased, to be less than the big man, led him to attack other students with some kind of a club."

Defendant persuasively argues that the testimony about the clubbing incident—which Dr. Gitchoff had learned from defendant and which he related in describing the basis of his opinion—could not be considered for the truth of the matter, that the prosecutor must have known this, and hence that his use of the testimony as evidence that the clubbing occurred constituted misconduct. ██ It is well settled that an expert's testimony as to a defendant's incriminating statements may not be regarded as proof of the facts described in such statements. (See, e.g., *People* v. *Cantrell* (1973) 8 Cal.3d 672, 683 [105 Cal.Rptr. 792, 504 P.2d 1256]; *In re Spencer* (1965) 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33].) ██ The prosecutor must have been aware of the principle.

The misconduct, however, does not require reversal. Considering, on one side, the insubstantiality of the reference to the clubbing and, on the other, the weight of the evidence showing the callousness and viciousness of defendant's murder of Lock, we conclude that under any standard the comment was harmless.

## H

Defendant makes several contentions relating to the ruling on his application for modification of penalty under Penal Code section 190.4, subdivision (e) (hereinafter section 190.4(e)).

██ He first claims the trial judge engaged in judicial misconduct by reading, before he ruled on the motion, a letter written to him by Lock's father describing the effect the murder had on the family.

It seems clear to us that the trial judge, although evidently not acting in bad faith, engaged in misconduct: " '[a] judge should . . . , except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding.' " (*In re Fisher* (1982)

31 Cal.3d 919, 920 [184 Cal.Rptr. 296, 647 P.2d 1075], quoting Cal. Code Jud. Conduct, canon 3A(4).)

Although the harm threatened by a statement such as that read by the court here cannot be discounted (see *Booth* v. *Maryland, supra,* 482 U.S. at pp. 503-509 [96 L.Ed.2d at pp. 448-452, 107 S.Ct. at pp. 2532-2536]), we cannot conclude that the trial judge's action subjected defendant to prejudice. ▮ It is the rule that "the appellate court must assume that the trial court was not influenced by irrelevant matters [citation]." (*People* v. *Ozene* (1972) 27 Cal.App.3d 905, 915 [104 Cal.Rptr. 170] [irrelevant material in probation report]; accord, *In re Contreras* (1975) 45 Cal.App.3d 549, 555 [119 Cal.Rptr. 757] [same].) ▮ The record requires us to follow that rule. Although at first the trial judge evidently thought it proper for him to consider the letter, he quickly changed his mind.[7] Moreover, his statement of reasons in support of his determination that the verdict was not contrary to law or the evidence demonstrates that he considered only relevant matters.

Defendant also claims the court applied an erroneous standard of review. His argument in support of this claim is ambiguous, but is nevertheless clearly unpersuasive. To the extent he argues the court failed to make an independent determination whether the jury's verdict was contrary to law or the evidence, his claim fails: the record reveals the court did in fact make such a determination. And to the extent he argues the court failed to review

---

[7] On this point, the following colloquy between the trial judge and defense counsel Adair is relevant: "THE COURT: There is something I neglected to put on the record, and I think I should. I think you should, if you want to know, that I read this. So you can address it if you feel it is appropriate. I think counsel are well aware that I received a letter dated December 28th—excuse me it was received in this court on December 28, 1982, from William R. Lock, the victim's father. I immediately gave a copy of that letter to all counsel. *I must tell you that letter was also considered, and is being considered at this time.* MR. ADAIR: Your Honor, I would object to that as far as the penalty stage itself goes, the death penalty. I don't think it is a proper factor to be considered by the Court. I do have Points and Authorities on that if you would like. But it is not mentioned in the statute as being an aggravating or mitigating factor. And we would submit—[¶] THE COURT: I must say for the record, I have read this letter, and it greatly affected me. MR. ADAIR: It was what? [¶] THE COURT: It had affected me at the time I read it. MR. ADAIR: I understand that, your Honor. I think it would affect anyone. But I am indicating, I don't think it is a factor that should be taken into consideration concerning the weighing process. It would not be an appropriate factor for the jury to consider during their deliberations on the penalty stage. And it is not an appropriate factor, I would submit, for your Honor to consider at this stage. [¶] THE COURT: I would agree at that point regarding the weighing process. *I can only consider what the jury has considered.* MR. ADAIR: Pardon me, your Honor? [¶] THE COURT: *I think I can only consider what the jury has considered with regard to the weighing process.* I am sorry I interrupted you. MR. ADAIR: I do object to the consideration of the letter. I can understand why it would be appropriate under the law concerning the penalty on the robbery; but I submit, it is not a relevant factor on determining the penalty when we talk about life without possibility of parole. [¶] THE COURT: *I agree, I don't think I can consider it in that question.*" (Italics added.)

the law and evidence as the "thirteenth juror" and to reduce the sentence if it were of the mind to cast its vote for the lesser penalty, the claim also fails. Assuming without deciding that the court was in fact required to apply such a standard, we are of the opinion that the court did indeed review the law and the evidence as the "thirteenth juror."

■■■ Defendant next claims the court erred by considering a probation report before ruling on his application for modification of penalty. He argues as follows: although the report was relevant to the issue of the appropriate sentence to be imposed for the robbery conviction, it was not relevant to sentencing on the murder conviction and contained information that could prejudice the ruling on the penalty-modification application. We agree that the report was not relevant to the court's determination. Under section 190.4(e), the court reviews the evidence presented to the jury—which, of course, does not include the probation report. We must assume, however, that the court was not influenced by the report in ruling on the application. (Cf. *In re Contreras, supra,* 45 Cal.App.3d at p. 555 [appellate court must assume the sentencing court was not influenced by irrelevant matters in probation report]; *People* v. *Ozene, supra,* 27 Cal.App.3d at p. 915 [same].)

Even if error was in fact committed, it must be deemed nonprejudicial. In denying the application, the court stated as follows. "I must say that I think the first aggravating factors, the circumstances of the crime, and the special circumstances of the robbery were such—demonstrated such a high degree of viciousness and callousness that they in themselves were the overriding factor of the jury. And I feel the overriding factor why the jury made the findings in this case, and were sufficient by themselves. [¶] I find that the aggravating circumstances outweigh the mitigating circumstances."

The court then considered each of the other factors and concluded as follows. "As required by law, the Court has considered all of the evidence. I can say that I have read carefully the transcript of this entire proceeding at least on three occasions. I have taken into account and been guided by the factors. I have heard and considered all of the arguments of counsel. I think I have now read every paper that has come in. The papers received prior to today were read and considered by me more than once. And analyzed on a number of occasions. The Court concludes and finds that the aggravating circumstances, the facts of the crime itself alone outweigh the mitigating circumstances presented. In coming to this conclusion the Court has relied most heavily on the first factor, that is the circumstances of the crime to outweigh all other possible mitigating circumstances. [¶] Therefore it is the Court's conclusion and opinion that the jury's findings and verdicts are not only supported by the weight of the evidence, but the Court, in its indepen-

dent review of all of the evidence, finds the jury's verdicts and findings are not contrary to the law and the evidence."

Because the source of the evidence going to the first factor was Finckel's incriminatory testimony, we believe the probation report—which adds nothing on this factor—was incapable of working any prejudice.

Defendant next claims the court erred by denying his motion to strike the probation report and to recuse the probation officer who prepared it on the ground the officer was biased. In view of the court's implicit statement that Finckel's testimony on the circumstances of the killing justified the death penalty in and of itself, any error that may have been committed was nonprejudicial.

Defendant finally claims the court erred by refusing or failing to consider his character and background evidence in mitigation. The record, however, is otherwise: the court plainly considered such evidence, but found it wanting.

I

Defendant contends he was entitled to the "benefits" of the Determinate Sentencing Act (Pen. Code, § 1170 et seq.)—specifically, discovery of statistics relating to sentences imposed in similar cases and disparate sentence review—under principles of equal protection. In *People* v. *Allen* (1986) 42 Cal.3d 1222, 1286-1288 [232 Cal.Rptr. 849, 729 P.2d 115], however, the lead opinion rejected a claim that was substantially similar. ■ We believe that its resolution of the point was correct: in our view, persons convicted under the death penalty law are manifestly not similarly situated to persons convicted under the Determinate Sentencing Act and accordingly cannot assert a meritorious claim to the "benefits" of the act under the equal protection clause (see, e.g., *Tigner* v. *Texas* (1940) 310 U.S. 141, 147 [84 L.Ed. 1124, 1128, 60 S.Ct. 879, 130 A.L.R. 1321]; *In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549]). Thus, we reject defendant's point.

J

Defendant contends the prosecutor engaged in misconduct after the penalty phase when he allegedly told at least two jurors during postverdict interviews that defendant had been involved in a stabbing incident—evidence of which was not admissible at trial. Such conduct would have been unethical and would have constituted misconduct. Formal Opinion No. 1976-39 of the State Bar's Standing Committee on Professional Responsibil-

ity and Conduct states that it is improper and unethical "for a prosecuting attorney to inform individual members of the jury, after the trial of a criminal case, of facts not admissible at the trial which are of a prejudicial or aggravating nature, such as the defendant's prior convictions for similar crimes." (Cal. Compendium of Prof. Responsibility, pt. II, State Bar formal opn. No. 1976-39, p. 1.) There is no evidence in the record, however, that supports this charge.

In any event, defendant fails to show how such misconduct could realistically have prejudiced him. We observe that the conclusion State Bar Formal Opinion No. 1976-39 reaches is premised not on any danger that disclosure of prejudicial facts may pose to the defendant whose trial has ended, but rather on the possible effect such disclosure might have on the juror's "state of mind . . . *in future jury service* . . . ." (*Ibid.*, italics added.)

### K

Defendant contends the death penalty law violates principles of equal protection and should be invalidated. He argues the law impermissibly discriminates between two classes of "youthful offenders" under the Youth Authority Act (Welf. & Inst. Code, § 1700 et seq.): those who are at least 18 years of age are subject to the ultimate penalty; those who are younger are not. The argument must be rejected because its premise is false. Even if less than 21 years of age at time of apprehension, persons who have been convicted of first degree murder are not "youthful offenders" for any relevant purpose under the Youth Authority Act. (See *id.*, § 1731.5, subd. (a)(2).)

Defendant also appears to argue that it is constitutionally impermissible for the state in its death penalty scheme to treat those less than 18 years of age differently from those 18 years of age or older. This court rejected the same argument in *People* v. *Turville, supra,* 51 Cal.2d 620, 638.

### L

▪ Defendant contends the death penalty law violates the due process guaranty of the federal and state Constitutions by penalizing those defendants who exercise their right to jury trial and thereby chilling the exercise of that right.

His argument runs in substance as follows: Defendant A is found guilty of first degree murder with special circumstances after a bench trial; he and the People do not waive a penalty phase jury; no matter what other-crimes evidence was properly admitted at the guilt phase, under Penal Code section 190.3 (hereafter section 190.3) the penalty phase jury may not be

presented with other-crimes evidence "which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence." Defendant B, by contrast, is found guilty following a jury trial; at the penalty phase the jury must consider, pursuant to Penal Code section 190.4, subdivision (d) (hereafter section 190.4(d)), all "evidence presented at any prior phase of the trial"—including, therefore, other-crimes evidence that did not involve the use or threat of force or violence. Under such a statutory scheme, defendant concludes, a defendant who exercises his right to a jury trial at the guilt phase is penalized, and all defendants are impermissibly deterred from exercising that right.

Although the argument has superficial appeal, we find it unpersuasive. First, we believe the "penalty" defendant discusses to be de minimis: capital defendants are unlikely to be deterred from demanding a jury by this possibility. Second and more important, sections 190.3 and 190.4(d)—as defendant himself acknowledges—can reasonably be construed to avoid any constitutional problems on this score. If the provisions are read together, they declare: "In any case in which the defendant may be subject to the death penalty, evidence presented at any prior phase of the trial . . . shall be considered on any subsequent phase of the trial, if the trier of fact of the prior phase is the same trier of fact at the subsequent phase" (§ 190.4 (d)), except for "evidence . . . regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence" (§ 190.3). Therefore, we reject defendant's argument that the death penalty law violates due process by interfering with the right to trial by jury.[8]

## M

Defendant contends the death penalty law violates the Eighth Amendment by preventing the introduction of a defendant's expressed willingness to plead guilty as evidence in mitigation. He argues that such evidence is relevant to show, for example, remorse or a willingness to take responsibility for one's criminal behavior. The point must be rejected. Nothing in the death penalty law even purports to bar such evidence.[9]

---

[8] To the extent defendant claims the instruction that the jurors consider all the evidence introduced at the guilt phase somehow prejudiced him, his argument, as we have explained, is unpersuasive.

[9] As defendant himself admits, the statutory provision he actually attacks is Penal Code section 1192.4: "If the defendant's plea of guilty pursuant to Section 1192.1 or 1192.2 is not accepted by the prosecuting attorney and approved by the court, the plea shall be deemed withdrawn and the defendant may then enter such plea or pleas as would otherwise have been available. The plea so withdrawn may not be received in evidence in any criminal, civil, or special action or proceeding of any nature, including proceedings before agencies, commis-

### N

Defendant finally contends the death penalty law is violative of due process "because a defendant may be sentenced to death because the jury found the killing to be 'callous' and 'vicious,' factors which are equivalent to the factors of heinous, atrocious and cruel, which the court struck down in *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797 [183 Cal.Rptr. 800, 647 P.2d 76]."

If defendant means the law does not adequately limit and direct the sentencer's discretion, the claim has already been considered and rejected. (*People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779.) If he means the court erred in ruling that the jury's verdict was not contrary to law or the evidence presented, the record is otherwise. Finally, if he means the court's reasons for its ruling were inadequate, he is again without support in the record.

We conclude that even if they are considered together, the penalty phase errors in this case do not require reversal. Even when his life is at stake, " '[a] defendant is entitled to a fair trial but not a perfect one.' " (*Schneble* v. *Florida* (1972) 405 U.S. 427, 432 [31 L.Ed.2d 340, 345, 92 S.Ct. 1056].) From our review of the record we are convinced that defendant did indeed receive a fair trial on the issue of penalty.

Finally, we are of the opinion that in view of the theories presented and the evidence introduced, the jury's guilt phase verdicts imply a finding that defendant was the actual killer (*Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368]). Having reviewed the record in its entirety, we conclude that this finding is amply supported by the evidence and adopt it as our own. Accordingly, we hold that the imposition of the penalty of death on defendant does not violate the Eighth Amendment. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716-717, 106 S.Ct. 689].)

---

sions, boards, and tribunals." It is not clear to us that section 1192.4 would bar *a defendant* from offering *in mitigation* his expressed willingness to plead guilty—when that expressed willingness does in fact tend to show remorse, etc. The fundamental purpose of the statutory provision appears to be to prevent *a prosecutor* from presenting such evidence *as an admission of guilt*. (See *People* v. *Hamilton* (1963) 60 Cal.2d 105, 113-114 [32 Cal.Rptr. 4, 383 P.2d 412].)

To the extent defendant claims the statutory scheme prevented him from introducing his alleged expressed willingness to plead guilty, this point too must be rejected: he failed even to attempt to introduce the evidence.

The judgment is affirmed.

Lucas, C. J., Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

Appellant's petition for a rehearing was denied September, 1988.