Filed 7/9/15  P. v. Keating CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHERIDAN LOUIS KEATING,<br><br>    Defendant and Appellant. | D067077<br><br><br>(Super. Ct. No. SCD255699) |


APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Daniel Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Sheridan Louis Keating of one count of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)) and one count of criminal threats (§ 422). The jury found that Keating used a deadly weapon during the commission of the threat count. (§ 12022, subd. (b)(1).) The court sentenced Keating to three years in prison.

Keating appeals challenging only the criminal threat conviction. As to that count he contends the court erred by failing to instruct the jury on voluntary intoxication, without request. In this case Keating represented himself. He denied he was intoxicated at the time of the offense and did not request an instruction on voluntary intoxication. We will follow established Supreme Court precedent, which provides in cases such as this, the trial court does not have a sua sponte duty to instruct on voluntary intoxication. Therefore we will reject Keating's contention and affirm the judgment.

STATEMENT OF FACTS

Keating does not challenge either the sufficiency or the admissibility of the evidence to support his convictions. Thus we will include only a summary of the facts of the offenses. We find the respondent's summary is accurate and adopt it here for convenience.

A. Prosecution Case

William Hatch lived with his mother, Ellen, in a house located at 2815 Charlar Avenue in San Diego. Hatch's niece, Debbie Martin, was permitted to live on the house's covered back patio but was not allowed to entertain visitors and was not allowed to enter

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

the main house when Hatch and his mother were not present. Appellant was Martin's boyfriend. Hatch had told appellant he was not welcome at the house on at least eight occasions. Appellant had previously confronted Hatch and gotten "in [his] face."

On April 25, 2014, around 3:45 p.m., Hatch was outside his home when he heard loud yelling. He looked down the street and saw appellant approaching. Using Hatch's name, appellant was screaming, "I'm going to fuckin' bash your brains in. You are a dead fuck. Come on up. I'm going to fuck you up." Hatch had never seen anyone this irate in his life. When appellant was six feet away from Hatch, appellant dropped the knapsack he was carrying, and revealed a steel car strut. Appellant was holding the strut like a baseball bat. Hatch was afraid, and didn't know what to do, so he retreated from his driveway into the street to give himself more room to maneuver. Appellant continued to scream, "I'm going to frickin' kill you, jack you up. I'm going to fuck you up, bash your brains in."

Hatch's neighbor, William Barlow, saw appellant, who was armed with a vehicle strut, begin running toward Hatch's house. Barlow believed appellant was "drunk or on drugs." When Barlow saw appellant threatening Hatch with the strut, Barlow approached and startled appellant. This caused appellant to direct his attention toward Barlow. With appellant temporarily distracted, Hatch retreated up his driveway toward his open garage to retrieve a shovel he could use to keep appellant away. Unable to find a shovel, Hatch retrieved a weeder—a two or three foot long, pronged, gardening tool. Equipped with the weeder, Hatch ran back into the street where he saw appellant and Barlow struggling with each other. Hatch yelled and appellant whirled and charged toward him, still armed with

3

the strut. Hatch held the weeder out with both arms. Appellant continued to curse at Hatch; however, Hatch was able to use the weeder to keep appellant away. In an attempt to close the distance, appellant reached out and used his hand to push the weeder downward. Hatch did not want to hurt appellant, but he shoved one of the weeder's barbs into appellant's leg, hoping this would cause appellant to drop his weapon. Because the first puncture wound "only phased him for a second," Hatch used the weeder to pierce appellant's leg a second time. However, appellant continued to aim the strut at Hatch's head, swinging the strut four to six more times, until appellant was exhausted. Wearied, appellant dropped the strut to the ground and fell to his knees. Barlow then retrieved the strut and moved it out of appellant's reach.

Hatch directed appellant to stay on the ground and told him police were on the way. When appellant heard that police were coming he attempted to rise to his feet. Hatch used the weeder's handle to trip appellant, who fell back to the ground. Hatch continued to trip appellant each time he got to his feet. Eventually, appellant was able to stand, by grabbing the weeder. Once on his feet, appellant let go of the weeder, grabbed Hatch's shirt, and took a swing at him. Hatch retreated backwards and his shirt was nearly ripped from his body. Hatch then hit appellant on the side of his head. Appellant took another swing at Hatch, who avoided the blow and landed another punch. After the second punch, appellant staggered to the ground. Upon hearing again that the police were on their way, appellant once more stumbled to his feet.

San Diego police officer Eric Oberndorfer was the first to arrive at the scene. He observed two men wrestling with a garden tool. Oberndorfer noticed that appellant

4

appeared dirty and disheveled, with blood shot eyes, and spittle on the corner of his mouth. Because appellant was acting in a violent and aggressive manner, and appeared agitated and angry, Oberndorfer ordered appellant to the ground. Appellant complied. Oberndorfer handcuffed appellant, who remained aggressive and continued to scream. When paramedics arrived at the scene, they saw that appellant's leg had been punctured. When paramedics attempted to treat appellant, appellant became violent, thrashing around and spitting on them. Oberndorfer then had to place a spit sock over appellant's mouth.

After appellant was transported to the hospital, his behavior did not improve. Appellant continued to act violently and had to be restrained. He berated the hospital's African-American security guard, referring to him as a "nigger." He also insulted the hospital's nursing staff by referring to them as "bitch" and "cunt." He even called his attending physician a "piece of shit . . . that didn't know what he was doing." Eventually, appellant had to be sedated. At the hospital, appellant tested positive for amphetamines and had a blood alcohol level of .17.

Ellen Hatch and Margaret Kim each observed the altercation and called 9-1-1. Their recollections of the incident were similar to that of Hatch. Kim testified that appellant appeared as if he was "definitely on something." Deborah Martin, appellant's girlfriend, also testified. According to Martin, appellant, who was "extremely drunk" and angry, came to visit her on the day of the altercation. Martin attempted to lure appellant away from her house by riding away on her bike. Appellant initially followed her, but then stopped and returned to the house.

5

## B. Defense Case

Appellant testified that on April 25, 2014, he started drinking around noon. Appellant was in a "good-hearted mood" and was feeling happy. Appellant decided to visit his girlfriend to see if she had food for him. When Hatch saw appellant, he waved him over to where he was standing. When appellant approached, Hatch suddenly attacked. Appellant was knocked unconscious. When appellant awoke, he saw Barlow and Hatch stabbing him. Appellant passed out again until he heard sirens responding to the call. Appellant was shocked that police handcuffed him but did not handcuff his attackers. Because he was upset that he was being arrested, and Hatch was being allowed to go free, appellant became uncooperative.

## DISCUSSION

Keating contends the trial court had a duty to instruct the jury, using CALCRIM No. 3426 on the effects of voluntary intoxication on his ability to form the specific intent required by section 422. He recognizes he denied intoxication at trial. He also recognizes there is case law indicating there is no sua sponte duty on trial courts to give such instruction. He contends, however, there was considerable evidence of his intoxication at the time of the offenses and since he was self-represented we cannot expect he would know enough to ask for the instruction. We are aware of no exception to the rules on sua sponte instructions for self-represented defendants. Further, such instruction would be inconsistent with Keating's defense at trial.

6

## A. Legal Principles

A trial court in a criminal case has a duty to instruct the jury, even without request, on all defenses that are consistent with the defendant's theory of defense and are supported by substantial evidence. (*People v. Barton* (1995) 12 Cal.4th 186, 195.) We review challenges to jury instructions "which involve[] the determination of applicable legal principles under the de novo standard." (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

Instructions on the effect of voluntary intoxication on a defendant's ability to form a specific mental state have been characterized as "pinpoint instructions" which must be requested. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 670.) In *People v. Saille* (1991) 54 Cal.3d 1103 the court said:

> "[D]efendant's evidence of intoxication can no longer be proffered as a defense to a crime but rather proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt. In such case the defendant is attempting to relate his evidence of intoxication to an element of the crime. Accordingly, he may seek a 'pinpoint' instruction that must be requested by him [citation], but such a pinpoint instruction does not involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court." (*Id.* at p. 1120.)

The court reaffirmed the position taken in *Saille* in *People v. Bolden* (2002) 29 Cal.4th 515, 559.

## B. Analysis

Keating admitted he had been drinking at the time of the offenses, but denied he was intoxicated. His defense was that the victim attacked him and that he did not

7

threaten or assault the victim.  The defense did not offer any testimony on how the amount of drugs or alcohol Keating might have consumed would have affected his ability to specifically intend to threaten the victim.  Certainly there was abundant evidence of clear and unambiguous threats made by Keating.  However, there is nothing in the record that would inform the jury about the effect any intoxication may have had on specific intent.  (*People v. Williams* (1988) 45 Cal.3d 1268, 1311.)

Since Keating did not request a pinpoint instruction on intoxication, and the court did not have a duty to give one without request, we find no instructional error in this case.

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

McINTYRE, J.

IRION, J.

8